# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | ) **Chapter 11** |
| | ) |
| **PTL HOLDINGS LLC, *et al.*,**[1] | ) **Case No. 11-12676 (__)** |
| | ) |
| **Debtors.** | ) **(Joint Administration Requested)** |
| | ) |

## DECLARATION OF SCOTT J. NELSON IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Scott J. Nelson states under penalty of perjury:

1.     I am the Chief Executive Officer of Premier Trailer Leasing, Inc. ("Premier"), a corporation organized under the laws of the state of Delaware.  I am familiar with the Premier's day-to-day operations, business affairs and books and records.  I am also familiar with the day-to-day operations, business affairs and books and records of PTL Holdings LLC ("Holdings" and, together with Premier, the "Debtors"), a limited liability company organized under the laws of the state of Delaware.  Holding is the parent of Premier.  I am authorized to submit the Declaration on behalf of the Debtors.

2.     I submit this Declaration in support of the relief requested by the Debtors in the various motions and applications filed with this Court contemporaneously with this Declaration (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to the fulfillment of their duties as debtors in possession and the continuation of their business and to avoid the adverse effects of the chapter 11 filings.  I am familiar with the contents of each First Day Motion

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: PTL Holdings LLC (6723) and Premier Trailer Leasing, Inc. (3906).

(including the exhibits thereto) and believe that the relief sought in the First Day Motions is critical to enabling the Debtors to operate in bankruptcy with minimum disruption or loss of productivity or value. Such relief is therefore necessary to a successful reorganization.

3. This Declaration: (a) provides an overview of the Debtors' business, including

(i) an overview of the Debtors' business operations and (ii) the Debtors' corporate history and capital structure; (b) describes the events leading up to the filing of the Debtors' chapter 11 cases (the "Cases"); and (c) sets forth the relevant facts that support each of the First Day Motions.

4. Except as otherwise indicated, all facts set forth in this Declaration are based on (a) my personal knowledge, (b) information supplied to me by others within the Debtors' organizations, (c) my review of relevant documents, or, where noted, (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Part I - Overview of the Debtors' Business Operations

### I. Description of the Debtors' Business

5. The Debtors in these cases are Holdings and Premier. As described more fully below, Holdings is a holding company, formed for the sole purpose of owning the capital stock of Premier, with no other business or operations. Premier is an operating company in the semi-truck trailer rental and leasing business, headquartered in Grapevine, Texas. Premier offers short-term trailer rentals and long-term leases, including leases with purchase options. Premier also sells used semi-trailers and offers purchase and lease-backs of trailers as well as trailer maintenance services. Premier has a fleet of approximately 11,170 trailers, comprised predominantly of flatbeds and dry vans, approximately 2,061 of which are leased or rented from

2

Stoughton Trailers Acceptance Company LLC ("Stoughton"). Premier operates out of nineteen offices in fifteen different states in the United States.[2] Premier's competitors include Aurora, GE Capital Trailer Fleet Services, Hale, McKinney, National Semi-Trailer, Star, Ryder and XTRA.

6.     As of the date of the commencement of these Cases, Premier had approximately 65 employees nationwide, 56 of whom are salaried and 9 of whom are paid hourly. Of Premier's 18 corporate employees, 15 are located at the Debtors' main offices in Grapevine, Texas and King of Prussia, Pennsylvania, and 3 are located at remote locations. The remaining 47 of Premier's employees are located throughout Premier's branch offices.

## II.     Products and Services

### (A)     Trailer Leases

7.     Premier offers its customers long-term leases on trailers ranging in duration from 1 to 7 years. Premier's leases allow its customers flexibility with respect to the trailers the customers lease, in some cases even allowing them to switch out a trailer mid-lease to a trailer with different specifications should the needs of the customer change. Further, Premier offers custom-designed maintenance programs as well as leases with a purchase option at the end of the lease term. Premier also sells used trailers to its customers. Premier's trailer lease customers generally remit payment on a monthly basis by check, credit card, automated transfer or wire. Long-term trailer leasing currently represents approximately 37% of Premier's business.

---

[2] Premier has branch offices located in Albany, New York; Atlanta, Georgia; Birmingham, Alabama; Boston, Massachusetts; Charlotte, North Carolina; Chicago, Illinois; Cleveland and Columbus, Ohio; Dallas and Houston, Texas; Greenville and Columbia, South Carolina; Harrison, New Jersey; Hartford, Connecticut; Louisville, Kentucky; Philadelphia, Pennsylvania; Richmond, Virginia; and Orlando and Tampa, Florida.

### (B)    Short Term Rentals

8.    In addition to long-term leases, Premier offers rentals on daily, weekly or monthly terms. These short term rentals provide Premier's customers the freedom of not having any specific time or equipment obligations. Such short term trailer rentals are designed to help customers manage temporary and seasonal demands and unexpected peak business periods, avoid fleet obsolescence, experiment with new equipment, and replace out-of-service equipment. Premier also arranges for one-way moves for its customers with pre-approved drop off within Premier's branch network. Premier currently derives approximately 63% of its business through short term trailer rentals.

### (C)    Trailer Sales

9.    In the ordinary course of their business, the Debtors sell trailers which have reached the end of their lifecycle. For a trailer to be part of the Debtors' sale program it must be (a) older than fifteen (15) years and (b) not currently on hire. The Debtors implemented the trailer sale program in the third quarter of 2009 as a way of converting unused assets to cash. Prior to that time, trailers were retained for use as storage containers. The Debtors determined, in their business judgment, that it was advantageous to sell obsolete and idle trailers rather than retain them. Each month since the third quarter of 2009, as trailers become eligible for the sale program, trailer sales are coordinated through the Debtors' branch managers and the Debtors' Director of Asset Management. Trailers are purchased by end-users, dealers in used trailers or, in some instances, sold for scrap if the trailers are not in saleable condition. The trailers serve as collateral for Garrison, the lender on First Lien Credit Agreement (each as defined below). The Debtors arrange each sale on a rolling basis during the month. The Debtors collect and hold the proceeds of sale and generate a bill of sale for the trailer. Each week, the Debtors send a list of proposed trailer sales to Garrison for its consent. Upon receiving Garrison's consent to the sales,

4

the certificates of title for the trailer are released to the purchasers. On average the Debtors sell between 900 and 1,000 trailers per year, or approximately 80 trailers per month. In 2010 revenues from trailer sales were approximately $2.0 million For the six months of 2011 ending June 30, 2011, revenues from trailer sales were $1.4 million

### (D) The Stoughton Leases

10. The Debtors are party to certain leases encompassing approximately 1,849 trailers, with Stoughton (the "Stoughton Leases"). The Stoughton trailers are included in Premier's fleet that are available for lease or rent to Premier's customers. The Stoughton trailers represent a significant part of the Debtors' business. Each of the Stoughton Leases covers multiple trailers, and although there is no master lease, the Stoughton Leases all contain substantially the same terms. The Stoughton Leases require the Debtors to make monthly payments in respect of the leased trailers. The Debtors have arranged for all of the Stoughton Leases to be paid together in one payment, made in the third week of each month. In addition to the Stoughton Leases, the Debtors also rent approximately 213 additional trailers from Stoughton on a month-to-month basis.

## III. Corporate History

11. Holdings was formed in 2005 as a limited liability company by Angelo, Gordon & Co. ("Angelo Gordon") and Coda Capital, Inc. ("Coda"). Holdings is a holding company formed for the sole purpose of owning the capital stock of Premier, with no operations and no assets other than its interest in Premier. Premier was incorporated on June 3, 2005. As of the date hereof, Holdings is wholly-owned by AG/Coda Trailer Investors LLC, an entity formed jointly by Angelo Gordon and Coda, which as of the date hereof is in turn owned 100% by Angelo Gordon affiliates. Although the Debtors are headquartered in Grapevine, Texas, key members of management frequently travel to various of the Debtors' locations, and managerial

and operating decisions generally are made at two primary locations: Grapevine, Texas and King of Prussia, Pennsylvania. Holdings controls approximately 92% of Premier's equity, the balance of which is held in various amounts by current and former officers and directors, who acquired their equity either through direct purchase or awards from Premier's 2005 Restricted Stock Plan.

12. For the 2009 and 2010 fiscal years, Premier reported approximately $37,049,000 and $35,368,000, respectively, in total revenues and net losses of approximately $9,225,000 and $11,745,000, respectively. As of June 30, 2011, Premier reported $18,266,000 in total revenues and net losses of $4,758,000. In addition to their secured indebtedness (described below), the Debtors had unsecured trade debt of approximately $215,000 as of the Petition Date.

## IV. Capital Structure

### (A) Premier's First Lien Credit Agreement

13. In order to finance Premier's trailer fleet and provide for ongoing working capital needs, at their inception in 2005 the Debtors, with Premier as borrower and Holdings as guarantor, entered into a senior secured credit revolving facility (the "First Lien Credit Agreement"), dated June 3, 2005, with Bank of America, N.A. ("BofA"), the CIT Group/Business Credit Inc. and Textron Financial Corporation.[3] The First Lien Credit Agreement provides for a maximum borrowing capacity of $110 million, subject to a limitation on borrowing based on periodic appraisals of the Lenders' collateral, and matures on August 31, 2011. Interest on borrowings under the First Lien Credit Agreement accrues at varying rates based on BofA's base rate plus an applicable base rate margin, as defined in the First Lien Credit Agreement, or LIBOR plus an applicable LIBOR rate margin, as defined in the First Lien Credit

---

[3] BofA originally acted as administrative agent under the First Lien Credit Agreement.

Agreement. Currently, interest accrues on the First Lien Credit Agreement at the rate of Prime plus 2.5% per annum. The First Lien Credit Agreement is secured by a first lien on substantially all of the Debtors' assets. The original lenders under the First Lien Credit Agreement were Bank of America, N.A., The CIT Group/Business Credit, Inc., and Textron Financial Corporation. Burdale Financial Limited ("Burdale") acquired the outstanding loan commitment and outstanding borrowings owed to The CIT Group/Business Credit, Inc. in October of 2007. Affiliates of Garrison Investment Group ("Garrison") acquired the outstanding loan commitment and outstanding borrowings owed to lender Textron Financial Corporation in April of 2010. In April 2011 and in June 2011, Garrison acquired the outstanding loan commitment and outstanding borrowings owed under the First Lien Credit Agreement to BofA and Burdale, respectively. Accordingly, Garrison is the only current Lender under the First Lien Credit Agreement.[4] An affiliate of Garrison is the Agent.[5]

14. The First Lien Credit Agreement is an asset based revolver and letter of credit facility. As of the Petition Date, the total amount outstanding under the First Lien Credit Agreement was $83,377,855.05.

**(B) Premier's Second Lien Credit Agreement**

15. In October 2007, the Debtors, with Premier as borrower and Holdings as guarantor, entered into a term loan agreement with Fifth Street Mezzanine Partners III, L.P. ("Fifth Street") as lender, for borrowings of $17.5 million (the "Second Lien Credit Agreement"). The Second Lien Credit Agreement matures in October 2012. Interest accrues on

---

[4] The Garrison lender entities are GOF II NON RE LO LLC, GOF II NON RE LO Series B LLC, GOF Class C LLC, GOF Class A and B LLC, Fairchild Offshore Master Fund L.P., and Fairchild Offshore Master Fund II L.P.

[5] Garrison Loan Agency Services LLC (the "First Lien Agent") is the current agent on the First Lien Credit Agreement.

DOCS_DE:170831.11 70938-0001

the Second Lien Credit Agreement at a rate of 16.5% per annum as long as certain financial covenants are complied with, as specified in the Second Lien Credit Agreement. The interest is payable monthly at 13.25% payable in cash, and the remaining 3.25% is added to the outstanding principal loan balance ("PIK Interest"). Fifth Street has a second lien on substantially the same collateral package provided to the Agent under the First Lien Credit Agreement. The default interest rate is 17.25% per annum exclusive of the 3.25% PIK Interest. Effective August 1, 2009, Premier ceased payment of the required monthly interest payments on the Second Lien Credit Agreement. Outstanding borrowings under the Second Lien Credit Agreement, inclusive of PIK Interest and unpaid interest, were approximately $27.1 million as of July 31, 2011.

16.     The Second Lien Credit Agreement contains a cross default provision that is triggered upon an event of default under the First Lien Credit Agreement. However, Fifth Street and the Lender are party to an intercreditor agreement, dated October 23, 2007 (the "Intercreditor Agreement") that limits Fifth Street's remedies with respect to the collateral.

## Part II - Events Leading up to Bankruptcy

## V.     Effect of the Global Economic Recession

17.     From its founding in 2005 through mid-2008, Premier enjoyed rapid success, growing its business to the point where it controlled more than 13,000 trailers. When the economy fell into recession in late 2008, the trucking industry was severely affected. Faced with rising fuel costs and decreased demand for interstate shipping, monthly tonnage (a common measurement of the health of the trucking industry) fell by almost 15% from the year prior in November and December of 2008 and a significant number of trucking bankruptcies (more than 2,000 in 2008-2009 alone) occurred. The decrease in demand resulted in significant overcapacity in the trucking industry of trailers available to customers for lease or rent and, together with the reduction in the available customer pools caused a sharp decrease in trailer

prices and a severe slowdown in Premier's business. Premier saw its business shift away from leases and towards short term rentals, and, according to a presentation prepared by the Debtors and delivered to the Lenders in July 2009, its revenue per rental unit fall by almost 9% and total utilization of its fleet fall by approximately 17% by mid-2009. All of these factors, taken together, negatively impacted the value of Premier's business.

## VI. Initial Discussions with Lenders

18. In February 2009, the Debtors received an appraisal from Hilco Enterprise Valuation Services LLC ("Hilco") for purposes of determining the borrowing base under the First Lien Credit Agreement. The Hilco appraisal valued the Debtors' trailer assets serving as collateral for the First Lien Credit Agreement as of December 31, 2008 at approximately 40% less than their value in the Hilco appraisal six months earlier. The Lenders and the Debtors questioned portions of the methodology underlying the new valuation and, while adjustments to the methodology and other various alternatives to obtain compliance were discussed, the Lenders agreed to delay adjustment of the Debtors' borrowing base and the Debtors continued to operate normally under the prior valuation.

19. In mid-July 2009, the Debtors met with the Lenders to discuss the then-current state of the Debtors' business, prospects for recovery and options going forward. Shortly following the meeting, the Lenders required Debtors' borrowing base under the First Lien Credit Agreement to be premised on the Hilco appraisal as of December 31, 2008 that was delivered in February 2009. As a result, the Debtors suffered a significant downward adjustment to their borrowing base which left them significantly overadvanced under the terms of the First Lien Credit Agreement, causing an event of default under the First Lien Credit Agreement to occur. Thereafter, the Debtors' only access to capital was through advances by the Lenders, which required their unanimous consent. Thereafter, the Debtors and the Lenders worked together on a

9

day to day basis to satisfy the Debtors' liquidity needs by having the Lenders make discretionary advances under the First Lien Credit Agreement.

20. On July 22, 2009, the Agent sent a letter to the Debtors pursuant to which the Agent agreed to forbear from exercising its remedies under the First Lien Credit Agreement so long as the Debtors agreed to permit the Lenders to retain an independent consultant, at the Debtors' expense, to review the Debtors' financial position and otherwise cooperate with the Agent in its attempts to determine the proper direction for the Debtors' restructuring (the "Forbearance Letter"). The Debtors have received additional extensions of the forbearance period through and including August 31, 2011.

21. In August 2009, the Debtors ceased making payments on the Second Lien Credit Agreement, which has continued to accrue both cash pay and the PIK Interest. Because of the Intercreditor Agreement, Fifth Street has been unable to exercise its rights and remedies under the Second Lien Credit Agreement.

22. In connection with the Forbearance Letter, the Lenders retained certain advisors to assist them in analyzing the Debtors' business. The Debtors' management worked diligently with the Lenders' advisors to provide necessary information and assist in their efforts on behalf of the Lenders. During this period, the Debtors undertook action to reduce overhead and change the overall direction of the business, including headcount reductions, branch consolidations, inventory reductions and changes to the Debtors' management. Discussions between the Lenders and the Debtors slowed as the Lenders considered their options and the Lenders and Debtors waited to see the results of these measures.[6]

---

[6] Throughout this time no lender owned a majority of the Senior Facility and, consequently, any agreements with respect to the Debtors' restructuring required the consent of at least two of the three lenders.

## VII.    The Marketing and Sale Process

23.    In January 2010, the Lenders retained Abacus Advisors LLC ("Abacus") to analyze the Debtors' business and assist the Lenders in brokering a workable transaction. Abacus was retained only for a short time, however, and was replaced in that same month by Carl Marks Advisory Group LLC ("Carl Marks"). In February 2010, the Debtors retained Lazard Middle Market LLC ("Lazard") to assist in evaluating and marketing the Debtors' business and assets for a potential sale to a third party. Lazard, with the Company's assistance, identified and contacted 69 potential investors it believed might be interested in acquiring the Company. Lazard identified the potential investors based on a number of factors, including their known desire to invest in companies in the transportation and equipment leasing sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction. An initial diligence package containing a Confidential Information Memorandum detailing information on the Company's operations, industry, and historical and projected financial information was distributed to 38 interested parties who executed non-disclosure agreements. Additionally, parties were granted access to an electronic data room. Interested parties were invited to attend management presentations during March and April 2010 and management held multiple meetings with 12 interested parties. Following discussions with senior management and the initial diligence package, investors were invited to submit non-binding indications of interest. The Company received non-binding term sheets from 10 interested parties, including one strategic bidder. Each of these bids was subject to legal, business and financial due diligence as well as other conditions precedent. After subsequent diligence and discussions with Lazard, interested parties were invited to submit revised bids. At that time, the Company received non-binding term sheets (or affirmation of previous bid) from 7 interested parties. However, the Lenders found that the consideration proposed in the bids was

11

insufficient and formal efforts to sell the Debtors' business were terminated in June 2010. Subsequently, in September 2010, the Company received an unsolicited bid from a sponsor-backed strategic buyer, however, the purchase price offered was below the range of other bids received and the price was deemed unacceptable by the Lenders.

24.     Following the conclusion of the sale process, negotiations moved to a lender-led restructuring transaction, with proposals from the Debtors that involved an infusion of additional liquidity to grow the business and repay the Lenders either through growth of the Debtors' business or a sale of the business in a more favorable economic climate. When the Lenders refused to provide a capital infusion in an amount the Debtors believe necessary to accomplish the Lenders' goals, the Debtors proposed alternative structures involving third party financing. A meeting was held and term sheet delivered by the Debtors to the Lenders in early September of 2010 proposing a joint venture structure designed to allow the Lenders to recover a significant portion of their debt and the Debtors to receive needed liquidity through a third party. The Lenders and the Debtors exchanged term sheets, and several negotiation sessions were held during the fall of 2010. However, these negotiations were ultimately unsuccessful.

## VIII.   Events Leading to the Bankruptcy Filing

25.     Commencing in January 2011, the Lenders advised the Debtors that they engaged advisors to analyze the Debtors' operations and prepare for an orderly wind-down of the Debtors' business. In mid-April 2011, while negotiations concerning the wind-down of the Debtors' business were ongoing, BofA sold its position in the First Lien Credit Agreement to affiliates of Garrison. On April 20, 2011 BofA resigned as Agent and was replaced by an affiliate of Garrison, effective May 20, 2011. Following BofA's resignation as Agent and Garrison's acquisition of a controlling interest in the First Lien Credit Agreement, the Debtors

and the Lenders entered into negotiations for a restructuring of the Debtors' indebtedness that would allow the Debtors to continue as a going concern.

26.     The Debtors' management and directors, together with their advisors, worked diligently with the Lenders to arrive at a structure that would maximize recovery for the Lenders and the Debtors' other creditors and constituencies. Ultimately, the Lenders were not able to agree on a workable solution to either restructure the Debtors' obligations and keep operations going forward or wind down the Debtors' obligations and liquidate the assets. Garrison and Burdale subsequently negotiated for Garrison's purchase of Burdale's interest in the First Lien Credit Agreement which allowed Garrison to become the sole Lender under the First Lien Credit Agreement.

27.     On June 7, 2011, Garrison and certain of its affiliates purchased Burdale's interest in the First Lien Credit Agreement. As the sole remaining Lender, Garrison agreed to extend the maturity date on the First Lien Credit Agreement to August 31, 2011 and Garrison and the Debtors negotiated the Debtors' reorganization prospects.

28.     On the date hereof, the Debtors filed the *Prepackaged Joint Chapter 11 Plan of Reorganization of PTL Holdings LLC, et al. Under Chapter 11 of the Bankruptcy Code* (the "Plan"). The primary purpose of the Plan is to effectuate the restructuring and substantial de-leveraging of the Debtors' capital structure in order to bring it into alignment with the Debtors' present and future operating prospects and to provide the Debtors with greater liquidity. The Plan will allow the Debtors to continue their businesses in the ordinary course and gives holders of debt under the First Lien Credit Agreement, at the election of such holders, either (a) a payment from the reorganized Premier's exit financing facility in an amount to be determined such that reorganized Premier, after the payment is made, will have availability of $20 million under such exit facility (the "First Lien Credit Agreement Lenders' Cash Payment"), or,

alternatively, (b) issuance by reorganized Premier of a note in the amount equal to the First Lien

Credit Agreement Lenders' Cash Payment, or such lesser amount as may be agreed to by the

First Lien Lenders, secured by liens on all the assets of the reorganized Premier, junior only to

the liens under exit financing facility. The First Lien Credit Agreement Lenders' Cash Payment

is in exchange for the cancellation of the First Lien Credit Agreement and the discharge of

obligations owed thereunder. Holders of Second Lien Credit Agreement and general unsecured

claims against the Debtors will not receive any distributions under the Plan. The existing

membership interests in Holdings will be cancelled and such holders will not receive any

distributions on account of such interests.

29. In connection with developing the Plan, the Debtors reviewed their current

business operations and compared their prospects as an ongoing business enterprise with the

estimated recoveries in various liquidation scenarios. As a result, the Debtors concluded that the

Debtors' enterprise value would be maximized by continuing to operate as a going concern. The

Debtors believed that their businesses and assets have value that would not be realized in a

liquidation, either in whole or in substantial part. Consistent with the liquidation analysis

described in the disclosure statement which accompanies the Plan, the value of the Debtors'

assets would be greater if the Debtors operate as a going concern instead of liquidating.

Moreover, the Debtors believe that any alternative to confirmation of the Plan, such as an out-of-

court restructuring, liquidation, or attempts by another party in interest to file a plan of

reorganization, would result in significant delays, litigation, and additional costs, and ultimately

diminish the Debtors' enterprise value.

30. Prior to the commencement of the Cases, the Debtors solicited

acceptances of the Plan from the holders of claims of the First Lien Credit Agreement which

makes up the claims in Class 3(B) under the Plan. Class 3(B) voted to accept the Plan. No other

classes of claims are entitled to vote under the Plan. The vote from Class 3(B) constitutes 100 % acceptance of the Plan by those classes of claims eligible to vote on the Plan.

31.    On the date hereof, the Debtors commenced the Cases in their continuing effort to reorganize and proceed to confirmation of the Plan.

## FIRST DAY MOTIONS AND APPLICATIONS

32.    To minimize the adverse effects of the commencement of the Cases on their business, the Debtors have requested various types of relief in their First Day Motions.[7] The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' operations caused by their bankruptcy filings, thereby preserving the value of the Debtors' estates for the benefit of their stakeholders. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders. The following paragraphs describe the factual bases for the relief requested in each of the First Day Motions.

**A.    Debtors' Motion Pursuant to Bankruptcy Rule 1015(B) and Local Rule 1015-1 for an Order Directing Joint Administration of Related Chapter 11 Cases**

33.    The Debtors seek entry of an order consolidating the Cases for procedural purposes only. Accordingly, the Debtors respectfully request that the Clerk of the Court maintain one case file and one docket for the Cases, under the number assigned to PTL Holdings LLC, and that the one official caption be used by all parties in all pleadings.

---

[7] Capitalized terms used but not defined herein shall have the meanings set forth in the relevant First Day Motion.

34.     The Debtors in these proceedings, Holdings and Premier, are affiliates.

35.     The Debtors' financial affairs and business operations are closely related.

36.     I am informed that through joint administration of these Cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

37.     I understand that the Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.   I also understand that the Debtors' creditors will not be adversely affected by the joint administration of these Cases because this motion requests only administrative, not substantive, consolidation of the estates.

38.     Accordingly, I believe that the relief requested in the motion is in the best interests of the Debtors, their estates, creditors and other parties in interest and, therefore, I respectfully request that the Court enter an order granting the relief requested.

**B.     Debtors' Application for an Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Noticing, Claims and Balloting Agent, Nunc Pro Tunc to the Petition Date**

39.     The Debtors seek to retain KCC as their notice and claims agent ("Claims Agent") in these Cases in accordance with the KCC Agreement for Services (the "Services Agreement") between the Debtors and KCC.  By reason of KCC's extensive experience in the industry, the Debtors believe that the retention of KCC is in the best interests of the Debtors and their estates and creditors.

40.     The Debtors estimate that there may be over 200 creditors holding claims against the Debtors' estates.  Furthermore, the Debtors believe that there are hundreds of creditors, former employees and other parties-in-interest who require notice of various matters, and in particular the deadline for filing proofs of claim.  Additionally, many of these parties may file proofs of claim and cast ballots with respect to a chapter 11 plan.

DOCS_DE:170831.11 70938-0001

41.     I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Cases and other developments in the Cases.    Accordingly, I respectfully request that the Court authorize the Debtors to retain KCC.

**C.      Motion of the Debtors Pursuant to Sections 105(A), 327, 328 and 330 Of the Bankruptcy Code for an Order Authorizing the Debtors To Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business**

42.     The Debtors seek entry of an order authorizing them to (a) retain and employ the Ordinary Course Professionals on an "as needed" basis without the submission of separate, formal retention applications for each Ordinary Course Professional, and (b) establish procedures to compensate the Ordinary Course Professionals for postpetition services rendered and expenses incurred.

43.     The Debtors cannot continue to operate their businesses unless they retain and pay for the services of the Ordinary Course Professionals listed on Exhibit A to the motion. The work of the Ordinary Course Professionals is directly related to the preservation of the value of the Debtors' estates, even though the amount of fees and expenses incurred by the Ordinary Course Professionals represents only a small fraction of that value.

44.     The operation of the Debtors' businesses would be severely hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtors while the Debtors (i) submitted to this Court an application, affidavit and proposed retention order for each Ordinary Course Professional; (ii) waited until such order was approved before such Ordinary Course Professional continued to render services; and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to Chapter 11 professionals.

45.     Further, a number of Ordinary Course Professionals are unfamiliar with the fee application procedures employed in bankruptcy cases. Some Ordinary Course Professionals might be unwilling or unable to assume the administrative and cost burden of such procedures, and may therefore be unwilling to work with the Debtors if these requirements are imposed, forcing the Debtors to incur additional and unnecessary expenses to retain other professionals without such background and expertise and at potentially higher rates. The uninterrupted services of the Ordinary Course Professionals are vital to the Debtors' continuing operations and their ultimate ability to reorganize. More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant, and such costs would be borne by the Debtors' estates.

46.     Accordingly, the Debtors request entry of the order attached to the motion.

**D.      Application Pursuant to Section 327(A) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors And Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

47.     The Debtors seek to employ Pachulski Stang Ziehl & Jones ("PSZ&J") as their bankruptcy counsel with regard to the filing and prosecution of the Cases and all related proceedings. The Debtors seek to retain PSZ&J as counsel because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for their representation of the Debtors in these cases, PSZ&J has become familiar with the Debtors' affairs and many of the potential legal issues which may arise in the context of the Cases.

48.     The Debtors believe the PSZ&J is both well-qualified and uniquely able to represent the Debtors in these cases. Thus, I respectfully request that the Court authorize the Debtors to retain PSZ&J as their bankruptcy counsel.

18

**E.    Debtors' Motion Pursuant to Sections 366 and 105(A) of the Bankruptcy Code for Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Utility Service or Discriminating Against the Debtors, (II) Determining that Utilities are Adequately Assured of Payment and (III) Establishing Procedures for Determining Adequate Assurance**

49.    The Debtors seek entry of the Interim Order: (i) prohibiting the Utility Companies from altering, refusing or discontinuing services to the Debtors on account of prepetition claims or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a Final Order; (ii) determining that the Utility Companies have received adequate assurance of payment for future utility services; (iii) establishing certain procedures for determining requests for additional assurance; (iv) approving the Debtors' proposed adequate assurances, and (v) scheduling a final hearing on the motion.

50.    In the normal course of their businesses, the Debtors use gas, water, sewer services, telephone, data and telecommunication services, waste management and other utility services provided by the Utility Companies at their corporate headquarters and at their nineteen branches in fifteen different states in the United States. These utility services are provided by approximately 65 providers through 75 separate accounts. The Debtors estimate that their average monthly obligations to the Utility Companies on account of services rendered total approximately $20,000, which amount was calculated based on the Debtors' historical monthly average payments to the Utility Companies.

51.    The Debtors propose to provide adequate assurance to the Utility Companies by maintaining a deposit of $10,000, equal to approximately the Debtors' estimated aggregate cost of two weeks of utility services calculated as a historical average over the past twelve months, into a newly created, segregated, interest-bearing account (the "Deposit Account"), within (20) business days of the Petition Date (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit shall be maintained with a minimum balance equal to the

19

Debtors' estimated two-week cost of utility services, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company.

52.     The Debtors believe that the proposed Adequate Assurance Deposit is more than sufficient to provide the Utility Companies with adequate assurance of payment.

53.     Should the Utility Companies refuse or discontinue services, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors would suffer a loss of revenue and customers. The temporary or permanent discontinuation of utility services at any of the Debtors' locations would cause irreparable harm to the Debtors' businesses and would jeopardize the Debtors' reorganization efforts. Accordingly, the Debtors request entry of an order granting the relief requested in the motion.

**F.     Application of PTL Holdings LLC, et al. For The Entry of an Order Authorizing The Debtors and Debtors in Possession to Employ and Retain Lazard Middle Market LLC as Investment Banker Nunc Pro Tunc to the Petition Date[8]**

54.     The Debtors seek entry of an order authorizing them to employ and retain Lazard Middle Market LLC ("LMM") to perform investment banking services for the Debtors upon the terms and conditions contained in (i) that certain letter dated as of February 23, 2010 (the "Engagement Letter"), by and between LMM and Debtor Premium Trailer Leasing, Inc., and its controlled subsidiaries, (ii) the related indemnification letter dated as of February 23, 2010 (the "Indemnification Letter"), and (iii) Amendment No. 1 to the Engagement Agreement dated as of April 14, 2011 (the "Amendment," and together with the Engagement Letter and the Indemnification Letter, the "LMM Agreement").

---

[8] The Lazard Middle Market LLC retention application will be filed after the Petition Date.

55. In consideration of the size and complexity of their business, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced investment bankers will substantially enhance their attempts to maximize the value of their estates.

56. The Debtors believe that LMM is well-qualified and able to advise the Debtors in a cost-effective, efficient, and timely manner.

57. The Debtors believe that LMM has developed significant relevant experience and expertise regarding the Debtors. The Debtors submit that the retention of LMM on the terms and conditions set forth in the LMM Application and in the LMM Agreement is necessary and appropriate, is in the best interests of their estates and creditors, and all other parties in interest,

58. Accordingly, I respectfully request that the Court authorize the Debtors to retain LMM.

**G. Debtors' Motion Pursuant to Sections 363(B), 507(A), and 105(A) of the Bankruptcy Code for an Order: (A) Authorizing the Debtors to (I) Pay Prepetition Employee Wages, Salaries and Other Compensation; (II) Contribute to and Honor Prepetition Employee Benefit Plans and Non-Executive Incentive Plans and Continue Such Programs in the Ordinary Course as Set Forth in the Motion; and (III) Make Deductions from Employees' Paychecks for, Among Other Things, Certain Employee Benefit Plans and Payroll Taxes; and (B) Authorizing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing**

59. As of the Petition Date, the Debtors employ 65 Employees, of which 56 are salaried and 9 hourly. Employees are compensated through wages and salaries and payments from certain incentive plans provided by the Debtors.

60. The Debtors estimate that they spend approximately $187,500.00 per pay period for Employee wages, salaries and payroll taxes. The Employees perform a variety of critical functions, including administration, accounting, supervisory, consultant, management

21

and other tasks. The Debtors must retain their Employees' skills, knowledge and understanding of the Debtors' infrastructure, and operations and customer relations to effect a successful reorganization. The uncertainty surrounding the chapter 11 process will likely cause Employees great concern. The successful reorganization of the Debtors' business will require significant efforts from their many valued Employees.

61.     The Debtors seek authority to pay, in their sole discretion, prepetition employee-related obligations in the ordinary course. In particular, the Debtors seek authority to pay and/or honor, as the case may be, in their sole discretion, certain prepetition claims of Employees, for, among other things, wages, salaries and reimbursement of business expenses, as well as non-executive business incentive plans and employee benefit obligations (including, without limitation, obligations arising under the Debtors' health, dental, and vision insurance; life and accidental death and dismemberment insurance; voluntary short-term disability insurance; long-term disability insurance; voluntary supplemental life insurance; business travel accident insurance; flexible spending account and health savings account plans; paid time off plans; and voluntary 401(k) savings plans, and to continue, maintain and fund in the ordinary course of business the Non-Executive Incentive Plans. The Debtors seek authority to make the foregoing payments and honor the foregoing obligations because the nonpayment of Employee compensation and the failure to honor Employee benefit obligations could seriously undermine morale, impose hardship on the Employees, generate doubt about the stability of the Debtors and their prospects for reorganization, and create a significant risk of Employee attrition. The relief requested in the Wages Motion is critical to the Debtors' reorganization effort and, therefore, I respectfully request that the Court enter an order granting the relief requested in the motion.

22

**H.    Debtors' Motion for Entry of Order (A) Providing Extension of Time to File Schedules and Statements of Financial Affairs; (B) Providing for Waiver of Requirement to File Schedules and Statements of Financial Affairs if Plan Becomes Effective Prior to Expiration of Such Extension; and (C) Directing The U.S. Trustee Not to Convene a Meeting of Creditors or Equity Security Holders**

62.    The Debtors seek entry of an order granting the Debtors an additional thirty (30) days to file their Schedules and Statements without prejudice to the Debtors' right to seek a further extension for cause shown, and, assuming the Debtors confirm the Plan prior to the expiration of such extended period and such Plan becomes effective, waiving the requirement that such Schedules and Statements be filed. Such an extension would give the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements. Inasmuch as the Debtors anticipate that the chapter 11 cases will be of a short duration, the Debtors respectfully seek to have the deadline to file their Schedules and Statements extended in the manner set forth in the motion. The Debtors do not plan to file a motion to establish a claims bar date because their proposed restructuring does not provide for the payment of any amounts to holders of general unsecured claims. In addition to the foregoing, the Debtors seek an order directing the U.S. Trustee not to convene a meeting of creditors.

63.    Given the prepackaged nature of the chapter 11 cases, the Debtors believe that the relief requested in this motion is appropriate and I respectfully request that the Court grant the relief requested in the motion.

**I.    Motion Pursuant to Sections 507(A)(8), 541(D) and 105(A) of the Bankruptcy Code For an Order (I) Authorizing the Payment of Prepetition Sales and Motor Vehicle, Property and Other Taxes and Government Charges and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing**

64.    In the ordinary course of business, the Debtors collect from customers and incur Sales and Motor Vehicle Taxes, Franchise and Corporate Taxes, Business License Fees, Property Taxes and other similar taxes, charges, assessments and fees (collectively the "Taxes

23

and Fees") necessary to operate their businesses. The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the Tax Authorities will not exceed $150,000.00 (the "Taxes and Fees Cap"). The Debtors seek entry of an order authorizing them to pay any prepetition Taxes and Fees or similar obligations to the respective Taxing Authorities in the ordinary course of the Debtors' business in an amount not to exceed the Taxes and Fees Cap, without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate, provided however, that such payments shall be made in accordance with and subject to the provisions of any debtor in possession financing order and related budget. Thus, I respectfully request that the Court approve the motion.

J. **Debtors' Motion Pursuant to Sections 105(A) and 363(B) of the Bankruptcy Code (I) Authorizing Debtors to Continue Using (A) Existing Cash Management System and Bank Accounts, (B) Existing Debit, Wire and Automatic Clearing House Payments and (C) Existing Business Forms, Stationery and Checks; (II) Authorizing the Debtors to Pay Certain Prepetition Obligations Related to the Use of the Cash Management System; and (III) Waiving the Investment and Deposit Requirements Set Forth in Section 345 of the Bankruptcy Code**

65.     The Debtors seek entry of an order (i) authorizing the Debtors to continue using their existing (a) cash management system and bank accounts, (b) debit, wire and automatic clearing house payments and (c) business forms, stationery and preprinted checks; and (ii) authorizing banks to honor certain prepetition obligations related to the use of the cash management system.

66.     I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines (the "UST Guidelines") to (i) close all of their existing bank accounts, (ii) open new "debtors in possession" bank accounts, and (iii) ensure that all checks and forms bear the designation "debtors in possession." If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtors' activities and would

24

impair the Debtors' ability to operate under chapter 11. Accordingly, the Debtors seek a waiver of these requirements.

67.     The Debtors also request authorization to (i) continue to use their existing stock of preprinted business forms, stationery and checks and (ii) maintain their present bank accounts, with the same account numbers, and treat such accounts for all purposes as "debtors in possession" accounts.

68.     Furthermore, the Debtors seek a waiver of the requirement to establish specific bank accounts for tax payments. The Debtors believe that tax obligations can be paid most efficiently out of the existing bank accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among and out of the bank accounts, and that the creation of a new debtor in possession account designated solely for tax obligations would be unnecessary and inefficient.

69.     In the ordinary course of their business, the Debtors maintain a cash management system (the "Cash Management System") to process customer payments and satisfy their obligations. Continued use of the Cash Management System and the Debtors' existing bank accounts, forms, stationery and preprinted checks will enable the Debtors to carry out their normal business activities without costly disruption. In contrast, discontinuing the Cash Management System, closing bank accounts and having new business forms, stationery and checks printed would cause unnecessary expense and hinder the Debtors' ability to process customer payments, meet their postpetition obligations and pay for services necessary for the continued operation of the Debtors' business. To ensure the smooth administration of the Debtors' Cases, it is imperative that the Debtors' existing cash management practices not be interrupted by implementation of new cash management procedures. Accordingly, I respectfully request that the Court grant the relief requested in the motion.

**K.**     **Motion Pursuant to Sections 105(A), 363, And 364 of the Bankruptcy Code for Authorization (I) to Pay Prepetition Claims of Critical Vendors and (II) to Authorize Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers**

70.     The Debtors seek entry of an order (i) authorizing the Debtors to pay all or a portion of the prepetition obligations owed to Critical Vendors. The Critical Vendors rely on quick and full payment from the Debtors. Absent such assurance of immediate payment in full, the Critical Vendors could refuse to work with the Debtors. Moreover, nonpayment of prepetition invoices would damage the Debtors' reputation in the business community. This, in turn, would disrupt and harm the Debtors' businesses and hinder the Debtors' ability to replace any departing Critical Vendors with alternative providers. It may also force the Debtors to obtain services elsewhere at a higher price or in a quantity or quality insufficient to satisfy the Debtors' needs. Given the importance of the services provided by the Critical Vendors, it is crucial that the Debtors be authorized to pay the Critical Vendors on an emergency basis. Accordingly, I respectfully request that the Court grant the relief requested in the motion.

**L.**     **Motion of the Debtors for an Order Authorizing, but not Directing, Payment of Certain Prepetition Trailer Repair Charges and Other Lien Claimants**

71.     The Debtors seek entry of an order authorizing them, in their discretion to pay claims of certain trailer repair vendors and other claimants who may assert liens against the Debtors' property which would impair the Debtors' ability to conduct their business.

72.     In authorizing these payments, the Court will provide the Debtors with the authority to minimize or eliminate disruption which could occur as a result of the commencement of the Cases.

73.     The Debtors rely on the services of outside vendors to, among other things, maintain their fleet of semi-trailers, semi-vans and flatbeds.

26

74.     Some of these vendors have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for the goods or services rendered (the "Lien Claimants"). The Lien Claimants perform various services for the Debtors, including repair and maintenance of trailers. Often, the Lien Claimants house the Debtors' trailers on their own premises while the trailers are under repair.

75.     Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, certain Lien Claimants may not have been paid for certain prepetition goods and services provided in respect of the repair and maintenance of certain of the Debtors' traders.

76.     As a result, the Lien Claimants may attempt to assert and perfect mechanics' or artisans' liens (the "Liens") against the Debtors' property.

77.     Assertion of these Liens could substantially impair the Debtors ability to conduct their business. The Debtors lease trailers to their customers and are under obligated to keep the trailers in good repair in many instances. Assertion of Liens could cause disruption in the services the Debtors provide to their customers which could result in severe damage to the Debtors' business. Accordingly, the Debtors request entry of an order granting the relief requested in the motion.

**M.      Motion for Entry of Order (A) Scheduling An Objection Deadline And Combined Hearing On Their Disclosure Statement and Plan Confirmation, (B) Approving Form And Notice Of Confirmation Hearing, (C) Establishing Procedures For Objections To Their Plan and Disclosure Statement, (D) Approving Solicitation Procedures and (E) Granting Related Relief**

78.     The Debtors respectfully entry of an order: (a) scheduling an objection deadline for objections to the Plan and Disclosure Statement and scheduling the Confirmation Hearing; (b) approving the form and manner of notice of the Confirmation Hearing;

(c) establishing procedures for objections to the Plan and Disclosure Statement; (d) approving the Solicitation Procedures; and (e) granting related relief.

79.     I understand this type of procedural relief is similar to relief granted in other prepackaged bankruptcy cases and will promote the prompt and efficient consideration of the Disclosure Statement and Plan in the Cases. Thus, I respectfully request that the motion be granted.

**N.     Motion for Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 and 364 And Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness with Priority Over all Secured Indebtedness and with Administrative Superpriority, (II) Granting Liens, (III) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing**

80.     The Debtors seek the entry of an Interim Order and a Final Order approving debtor in possession financing and use of cash collateral which, among other things, provides the Debtors with the following relief: (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral; (c) granting adequate protection to the First Lien Agent (for the benefit of the First Lien Lenders) and the Second Lien Agent (for the benefit of the Second Lien Lenders) to protect their interests, if any, for Debtors' use of Cash Collateral; (d) modifying the automatic stay; and (e) scheduling a final hearing to consider entry of the Final Order.   This financing will be documented in the Ratification and Amendment Agreement and Consent to Use Cash Collateral dated as of August 23, 2011 (the "Ratification Agreement") which ratifies certain aspects of the First Lien Credit Agreement and provides for new postpetition loans up to the principal amount of $1,500,000 without any roll-up of prepetition debt.

## TERMS

81.    Below is a summary of the terms of the proposed financing arrangement:

     a.    <u>Obligated Parties</u>: Premier and Holdings. Premier is the Borrower and Holdings is the Guarantor.

     b.    <u>First Lien Agent/Lenders</u>: Garrison Loan Agency Services LLC is the First Lien Agent and the First Lien Lenders are affiliates of the First Lien Agent.

     c.    <u>Amount and Type of Facility</u>: An extension of the Debtors' existing prepetition revolving facility by up to $1,500,000 in principal obligations, plus any interest, fees and other obligations accrued thereon.

     d.    <u>Availability</u>

     e.    <u>Use of Proceeds</u>: Debtors' seek authority to borrow up to the full principal amount of $1,500,000 in DIP Obligations pursuant to the Interim Order. Loan proceeds may be used to (a) pay interest, costs, and expenses incurred with respect to the DIP Obligations, and (b) finance ongoing general working capital needs of the Debtors, including, but not limited to chapter 11 professional fees and expenses (in each case, not otherwise prohibited by the Ratification Agreement), and the Debtors shall not use any portion of the proceeds of the post-petition financing, directly or indirectly in excess of amounts set forth in a budget approved by the First Lien Agent (the "Budget"), subject to certain variances and tested on a weekly cumulative basis.

     f.    <u>Priority and Security</u>: The DIP Obligations will secured by first priority priming liens against all assets of the Debtors and their estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out and excluding Avoidance Actions and the proceeds thereof. The DIP Obligations also shall be treated as superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out and without any rights as to Avoidance Actions and the proceeds thereof.

     g.    <u>Maturity Date</u>: The maturity date of the DIP Obligations will be the earliest to occur of: (i) October 7, 2011, (ii) the failure of the Debtors to obtain a Final Order on or before the date which is 30 days after the Petition Date, (iii) the effective date of a plan of reorganization, or (iv) the occurrence of an event of default under the First Lien Credit Agreement, as modified by the Ratification Agreement (the "Commitment Termination Date").

     h.    <u>Interest Rates and Interest Period</u>: The interest rate for the DIP Obligations will be the existing variable rate for Base Rate Loans under the First Lien Credit Agreement, which is currently 5.75% per annum.

DOCS_DE:170831.11 70938-0001

i.  Carve-Out:  The DIP Liens, DIP Superpriority Claims, the First Lien Lender Replacement Liens, the Second Lien Lender Replacement Liens, and the Prepetition Superpriority Claims (all as defined in the Interim Order) shall be subordinate only to the following (the "Carve-Out"):  (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; (b) allowed fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals employed by the Debtors and any official committee(s) of creditors pursuant to Sections 327 and 1103 of the Bankruptcy Code in the amounts set forth in the Budget accrued through the Commitment Termination Date, and up to the amount of $25,000 accrued thereafter.

j.  Conditions Precedent:  The conditions precedent to borrowing under the Ratification Agreement are customary and include, among other things, that all representations and warranties are accurate and no material adverse event has occurred.

k.  Debtors' Stipulations, Waivers and Releases:  The Debtors propose to stipulate to the amount, validity and priority of the prepetition claims of the First Lien Secured Parties.  The Debtors also seek to waive certain rights and causes of action and grant global releases in favor of the First Lien Secured Parties as to any and all prepetition claims, including the Debtors' rights under section 506(c) of the Bankruptcy Code, pending entry of the Final Order.  The Debtors' stipulations and waivers are subject to challenge by any party in interest or, if a committee is appointed, by such committee, filed within the earlier of (a) confirmation of a plan of reorganization; (b) sixty (60) days following the entry of the Final Order, (c) solely if a committee is not appointed, seventy-five (75) days following entry of the Final Order, (d) such later date consented to in writing by the First Lien Agent, or (e) such longer period as the Court orders for cause shown prior to the expiration of such period.

l.  Waiver or Modification of the Automatic Stay:  Subject to seven (7) business days prior notice, the automatic stay will be vacated in the event of default under the Ratification Agreement to permit the exercise of remedies by the First Lien Secured Parties.

m.  Amount of Cash Collateral to Be Used.  The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Budget.

n.  Parties with an Interest in Cash Collateral.  The parties with an interest in the Cash Collateral are:  (i) the First Lien Agent, for the benefit of the

First Lien Lenders,[9] and (ii) Fifth Street Mezzanine Partners III, L.P. (the "Second Lien Agent"), the lenders party thereto (together with their permitted successors and assigns in such capacity, the "Second Lien Lenders").[10]

o.      <u>Use of Cash Collateral</u>. The First Lien Agent, on behalf of the First Lien Lenders, has consented to the Debtors' use of Cash Collateral, wherever such Cash Collateral may be located, in accordance with the terms of the Interim Order and the Budget.

p.      <u>Termination Date</u>. The Debtors' ability to use Cash Collateral shall end on the Commitment Termination Date.

q.      <u>Adequate Protection to First Lien Lenders</u>. The Debtors have agreed to provide adequate protection to the First Lien Lenders pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to the extent of any diminution of the value of the interests of the First Lien Secured Parties in their prepetition collateral, in the form of additional and replacement security interests and liens in all of the assets of the Debtors and their estates, subject to the Carve-Out and excluding Avoidance Actions and the proceeds thereof, and junior only to the DIP Obligations and any prior permitted liens. In addition, the First Lien Secured Parties will have superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code for any such diminution in value, subject to the Carve-Out and excluding Avoidance Actions and the proceeds thereof, and junior only to the DIP Obligations. Subject to entry of the Final Order, the First Lien Agent (on behalf of the First Lien Lenders) shall have the right to "credit bid" the allowed amount of the DIP Obligations and the Pre-Petition First Lien Obligations during any sale of all or substantially all of its prepetition or postpetition collateral.

r.      <u>Adequate Protection to Second Lien Lenders</u>. The Debtors are prepared to provide adequate protection to the Second Lien Lenders[11] pursuant to

---

[9] The First Lien Lenders are affiliates of the First Lien Agent, GOF II NON RE LO LLC, GOF II NON RE LO Series B LLC, GOF Class A and B LLC, GOF Class C LLC, Fairchild Offshore Master Fund L.P., and Fairchild Offshore Master Fund II L.P.

[10] The Debtors believe that the value of the Debtors' property that is secured by the lien of the First Lien Agent is less than the amount of the aggregate obligations owed to the First Lien Lenders and, accordingly, the Second Lien Lenders have only an unsecured claim against the Debtors' estates. The Debtors propose, however, to provide the same adequate protection to the Second Lien Lenders that is being provided to the First Lien Lenders on account of their respective prepetition obligations, junior in all respects to the rights, protections and claims of the First Lien Lenders, including the DIP Obligations, and without prejudice to the Debtors' rights to seek to modify such adequate protection granted to the Second Lien Lenders.

[11] Although the Debtors do not believe that the Second Lien Lenders are entitled to adequate protection on account of the Debtor's use of Cash Collateral, and reserve all rights with respect to the provision of adequate protection to the Second Lien Lenders, the Debtors are prepared to offer the Second Lien Lenders the precise relief specified in the Intercreditor Agreement (as defined below), that is sufficient to fulfill the Second Lien Lenders' agreement not

**Footnote continued**

sections 361, 363(e) and 364(d) of the Bankruptcy Code, to the extent of any diminution of the value of the interests of the Second Lien Lenders in their prepetition collateral, in the form of additional and replacement security interests and liens in all of the assets of the Debtors and their estates, subject to the Carve-Out and excluding Avoidance Actions and the proceeds thereof, and junior only to the DIP Obligations, the replacement liens of the First Lien Secured Parties and any prior permitted liens.

s.    Automatic Perfection.  The liens, security interests and adequate protection provided in the Ratification Agreement, the Interim Order and the Final Order shall be valid, binding, enforceable, non-avoidable and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required under the laws of any jurisdiction to validate or perfect such security interests and liens.

### Prepetition Capital Structure

82.    As of the Petition Date, the Debtors had approximately $111 million of outstanding indebtedness on a consolidated basis, consisting of (a) approximately $83 million under a senior secured, revolving credit facility (the "First Lien Facility"), and (b) approximately $27 million under a second lien term loan (the "Second Lien Facility").  The following summarizes the Debtors' primary long-term debt obligations in order of priority.

83.    On June 3, 2005, the Debtors and the First Lien Lenders[12] entered into that certain *Loan and Security Agreement* (the "First Lien Credit Agreement"),[13] pursuant to which the lenders provided the Debtors with an asset-based, revolving credit loan to help finance the

---

**Footnote continued from previous page**

to object to any use of cash collateral on the grounds of a failure to provide adequate protection to the Second Lien Lenders.  *See* Intercreditor Agreement § 4.5(a).

[12] The original First Lien Lenders were Bank of America, N.A., The CIT Group/Business Credit, Inc., and Textron Financial Corporation.

[13] Holdings guaranteed the obligations of Premier as the borrower under the First Lien Credit Agreement. Holdings' obligations as guarantor are also secured by a lien on any collateral owned by Holdings, as well as by a pledge of the common and preferred stock issued by Premier and held by Holdings.

Debtors' trailer fleet and provide for ongoing working capital needs. The First Lien Facility presently matures on August 31, 2011.

84. As of the Petition Date, the total amount outstanding under the First Lien Facility was $83,377,855.05 million.

85. The Debtors' obligations under the First Lien Credit Agreement are secured by a first priority lien granted to the Prepetition Administrative Agent for the benefit of the Prepetition Senior Secured Lender on all of the Debtors' "Collateral," as defined in the First Lien Credit Agreement to include, among other assets and property, all of the Debtors' Accounts, Inventory, Goods, Equipment, Deposit Accounts, General Intangibles, money, cash and cash equivalents and contract rights and rights under leases of real and personal property whether as lessor or lessee (including any option to purchase thereunder), including any and all proceeds of the foregoing (all as defined in the First Lien Credit Agreement).

86. On October 23, 2007, the Debtors and the Second Lien Lenders entered into that certain *Credit Agreement* (the "Second Lien Credit Agreement"),[14] pursuant to which the Second Lien Lenders provided the Debtors with a $17.5 million secured term loan for general corporate purposes. The Second Lien Facility matures on October 23, 2012.

87. As of June 30, 2011, the Debtors owed approximately $27 million under the Second Lien Facility.

88. The Debtors' obligations under the Second Lien Credit Agreement are secured by liens on the same Collateral securing the obligations under the First Lien Credit

---

[14] As with the First Lien Credit Agreement, Holdings guaranteed the obligations of Premier as the borrower under the Second Lien Credit Agreement.

Agreement. The Second Lien Agent has a lien on the Collateral under the Second Lien Facility that is junior and subordinated to the liens of the First Lien Agent under the First Lien Facility pursuant to that certain *Intercreditor Agreement* dated as of October 23, 2007 (as amended, the "Intercreditor Agreement").

## Need for Financing

89.     The Debtors have an urgent and immediate need for the borrowings in the principal amount of up to $1,500,000 contemplated under the Ratification Agreement and the use of Cash Collateral. In order for the Debtors to continue to operate as a going concern during the Chapter 11 Cases, the Debtors must have ample liquidity to meet the needs, demands and obligations of and to their lessees, lessors, customers, suppliers, employees and taxing authorities.

90.     Without the proposed postpetition financing and continued use of the cash derived from customer payments to the Debtors, the Debtors will not have any liquidity to operate their business, and therefore will be unable to fund their ordinary course expenditures or pay the expenses necessary to administer the Chapter 11 Cases. Simply put, without access to financing and continued use of Cash Collateral, the Debtors will be required to cease operations and liquidate, causing irreparable harm to the Debtors, their estates and their creditors. Accordingly, the Debtors have an urgent and immediate need for the borrowings under the Ratification Agreement and continued use of Cash Collateral contemplated in the DIP Motion.

91.     For the above reasons, the Debtors have determined, in the exercise of their sound business judgment, that they require postpetition financing and use of Cash Collateral to, among other things, continue business operations and the payments and expenses attendant thereto, and the costs and expenses of administering these Chapter 11 Cases. As such, the

34

Debtors hereby request authority to incur credit in accordance with the Ratification Agreement and to use Cash Collateral in compliance with the proposed Interim Order and the Budget. The Debtors believe the adequate protection provided for in the Interim Order protects the prepetition lenders' interests in the Collateral. The First Lien Lenders are willing to extend financing in accordance with the terms of the Ratification Agreement and, as part of such agreement and in accordance with the Interim Order and the Budget, the First Lien Secured Parties have consented to the Debtors' use of Cash Collateral. Further, the adequate protection being offered by the Debtors to the Second Lien Lenders is fully consistent with the provisions of the Intercreditor Agreement under which the Second Lien Lenders have agreed not to object to bankruptcy financing or the use of Cash Collateral with the consent of the First Lien Agent.

92.     The Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

93.     The Debtors believe that any reorganization of their business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the Ratification Agreement and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the First Lien Lenders on terms more

favorable than the terms of the Ratification Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the Ratification Agreement.

94.     The Debtors believe that their efforts to obtain credit except as provided under the Ratification Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered. Prior to the commencement of these chapter 11 cases, the Debtors solicited potential debtor in possession financing from several sources. No one expressed any interest in providing financing given the existing lenders' outstanding obligations and "blanket" liens and the contemplated restructuring under the Plan. Further, based on the modest size of the proposed financing (up to $1,500,000) and the low interest rate (currently, 5.75% per annum) made available to the Debtors by the First Lien Lenders, no alternative financing proposals have been obtained.

95.     After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the First Lien Lenders pursuant to the terms of the Ratification Agreement represents the best financing presently available to the Debtors. Moreover, the Debtors and their advisors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the Ratification Agreement are even more affordable to the Debtors than the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

96.     In light of the foregoing, the Ratification Agreement is vital to maximizing the value of the Debtors' estates and should be approved by the Court.

97.     The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to access postpetition financing and use the Cash Collateral, pending the Final Hearing, in order to continue their operations and administer their Chapter 11 Cases. Without the ability to borrow

36

funds under the Ratification Agreement and use Cash Collateral, the Debtors would be unable to meet their postpetition obligations and would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' reorganization efforts. Accordingly, I respectfully request that the relief requested in the motion be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: August 23, 2011

By: _____
Scott J. Nelson
On behalf of the Debtors