PTL Holdings LLC ("Holdings") and its debtor affiliate Premier Trailer Leasing, Inc. ("Premier", and together with Holdings, the "Debtors" or the "Company")[1] are sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor entitled to vote to approve the *Prepackaged Joint Plan of Reorganization of PTL Holdings LLC, et al., Under Chapter 11 of the Bankruptcy Code*, dated August 22, 2011, as the same may be amended from time to time (the "Plan"). The Company is commencing this solicitation of your vote to approve the Plan (the "Solicitation") before the Company files voluntary cases under chapter 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code").

---

## DISCLOSURE STATEMENT FOR SOLICITATION OF ACCEPTANCES OF PREPACKAGED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

### DATED AUGUST 22, 2011

The Company has not commenced reorganization cases under chapter 11 of the Bankruptcy Code as of the date of this Disclosure Statement. If, however, the Company receives properly completed ballots indicating acceptances of the Plan, to meet the voting requirements prescribed by section 1126 of the Bankruptcy Code, it intends to file (but hereby expressly reserves the right not to file) with a United States Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Cases"), and to seek, as promptly thereafter as practicable, confirmation of the Plan. Because the Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Company files the Cases, it will seek in an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date (as defined below) will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: PTL Holdings LLC ("Holdings") (6723) and Premier Trailer Leasing, Inc. ("Premier") (3906).

Each holder of a Class 3(B) (First Lien Credit Agreement Claim) (defined in section II of the Plan) or authorized signatory for the beneficial owner of a First Lien Credit Agreement Claim will be requested to certify on its Ballot whether such holder or beneficial owner is an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act.  However, the failure to return the certification will not affect such holder's or such beneficial owner's right to receive a distribution under the Plan.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein.  Any representation to the contrary is a criminal offense.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Each recipient of this Disclosure Statement acknowledges that (a) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (b) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

The Company cannot assure you that the Disclosure Statement, including any exhibits to the Disclosure Statement that is ultimately approved by the Bankruptcy Court in the Cases, will not contain different, additional, or material terms that do not appear in this Disclosure Statement.  Therefore, the Company urges each Holder of a First Lien Credit Agreement Claim entitled to vote on the Plan (a) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Article XIX of this Disclosure Statement, entitled "Plan Related Risk Factors," and (b) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan.  You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

---

The deadline to accept or reject the Plan is 4:00 p.m. (Eastern time) on August 23, 2011, unless extended by the Company, in its discretion.

---

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors will be bound by the terms of the Plan and the transactions contemplated thereby.

---

## TABLE OF CONTENTS

**Page Number**

ARTICLE I. INTRODUCTION AND OVERVIEW ..................................................................... 1

A. Introduction ........................................................................................................... 1
B. Disclaimers ............................................................................................................ 2
C. Purpose and Effect of the Plan for Voting and for Distribution Purposes ........... 3
D. An Overview of the Chapter 11 Process ............................................................... 4
E. Plan Overview ....................................................................................................... 4
F. Who May Vote on the Plan ................................................................................... 5
G. Summary of Solicitation Package and Voting Instructions .................................. 6
H. Confirmation of the Plan ...................................................................................... 7
   1. Generally ......................................................................................................... 7
   2. The Confirmation Hearing ............................................................................. 7
I. Confirming and Consummating the Plan .............................................................. 8
J. Rules of Interpretation ........................................................................................... 8

ARTICLE II. HISTORY, ORGANIZATION AND ACTIVITIES OF THE COMPANY ..................... 8

A. Business Operations .............................................................................................. 8
B. Corporate History .................................................................................................. 9
C. Equity, Financing, and Significant Indebtedness ............................................... 10
D. Events Leading Up To the Proposed Restructuring ........................................... 11
   1. Effect of the Global Economic Recession .................................................... 11
E. Prepetition Marketing Efforts ............................................................................. 12
F. Anticipated Events of the Chapter 11 Cases ...................................................... 13
   1. Expected Timetable of the Chapter 11 Cases .............................................. 13
   2. First Day Relief ............................................................................................. 13

ARTICLE III. DESCRIPTION OF THE PLAN ...................................................................... 14

A. Treatment of Unclassified Claims ...................................................................... 15
   1. Administrative Claims ................................................................................... 15
   2. Priority Tax Claims ....................................................................................... 15
   3. Claims for Professional Fees ....................................................................... 15
B. Treatment of Classified Claims and Interests ..................................................... 16
   1. Classes 1(A-B) – Priority Non-Tax Claims. ................................................ 16
   2. Classes 2(A-B) – Other Secured Claims. ..................................................... 17
   3. Classes 3(A-B) – First Lien Credit Agreement Claims. ............................... 17
   4. Classes 4(A-B) – Second Lien Credit Agreement Claims. ........................... 18
   5. Classes 5 (A-B) – General Unsecured Claims. ............................................ 18
   6. Classes 6 (A-B) – Intercompany Claims. ..................................................... 19
   7. Classes 7(A-B) – Existing Equity and Membership Interests ...................... 19
C. Full Satisfaction, Discharge and Release ........................................................... 19

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .............................................. 19

A. Voting Class ........................................................................................................ 20
B. Presumed Acceptance of Plan ............................................................................. 20
C. Presumed Rejection of the Plan .......................................................................... 20
D. Confirmation of The Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 20
E. Controversy Concerning Impairment .................................................................. 20

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................ 20

A. Sources of Cash for Plan Distributions ............................................................... 20
B. Issuance of New Equity Interests in Reorganized Premier .................................. 21

i

C.   SECURITIES EXEMPTION ............................................................................................21
D.   POWERS OF REORGANIZED PREMIER ........................................................................21
E.   CANCELLATION OF SECURITIES AND AGREEMENTS ....................................................22
F.   EXIT FACILITY ........................................................................................................22
G.   NEW CHARTER DOCUMENTS ...................................................................................23
H.   DIRECTORS AND OFFICERS OF REORGANIZED PREMIER ............................................23
I.   REVESTING OF ASSETS IN REORGANIZED PREMIER ...................................................24
J.   CORPORATE TRANSACTIONS .....................................................................................24
K.   CORPORATE ACTION ...............................................................................................24
L.   EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS ...........................................24
M.   EXEMPTION FROM CERTAIN TAXES AND FEES .........................................................24
N.   EMPLOYEE AND RETIREE BENEFITS .........................................................................25
O.   PRESERVATION OF RIGHTS OF ACTION .....................................................................25
P.   DISCHARGE OF PREMIER .........................................................................................26
Q.   DEBTORS' RELEASES ..............................................................................................26
R.   UNITED STATES TRUSTEE FEES ...............................................................................26
S.   SUBORDINATION .....................................................................................................26

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .................................................**27**

A.   DATES OF DISTRIBUTIONS ........................................................................................27
B.   DISBURSING AGENT ................................................................................................27
C.   CASH DISTRIBUTIONS ..............................................................................................28
D.   ROUNDING OF PAYMENTS ........................................................................................28
E.   DISTRIBUTIONS ON ACCOUNT OF CLAIMS ALLOWED AFTER THE EFFECTIVE DATE ........28
    1.   *General Distribution Procedures.* ..................................................................28
    2.   *Address for Delivery of Distributions.* ..........................................................28
    3.   *Undeliverable Distributions and Unclaimed Property.* ...................................28
    4.   *Withholding Taxes.* ......................................................................................29
    5.   *Setoffs.* .......................................................................................................29

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ....................................**29**

A.   NO FILING OF PROOFS OF CLAIM .............................................................................29
B.   DISPUTED CLAIMS ...................................................................................................30
C.   PROCEDURES REGARDING DISPUTED CLAIMS ...........................................................30
D.   ALLOWANCE OF CLAIMS .........................................................................................30

**ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES  31**

A.   ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....31
B.   OBJECTIONS TO ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....31
    1.   *Objection Procedure Generally.* ....................................................................31
    2.   *Objection Based on Grounds Other Than "Cure" Amount.* ............................31
    3.   *Objection Based on "Cure" Amount.* .............................................................32
C.   PAYMENT RELATED TO ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....32
D.   REJECTION DAMAGE CLAIMS FOR REJECTED CONTRACTS .........................................32

**ARTICLE IX. EFFECTS OF CONFIRMATION AND RELATED PROVISIONS** ........................**32**

A.   EFFECT OF CONFIRMATION ......................................................................................32
B.   INJUNCTION ............................................................................................................33
    1.   *Generally.* ...................................................................................................33
    2.   *Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests. .33*
C.   EXCULPATION .........................................................................................................34
D.   DEBTOR RELEASE ...................................................................................................34
E.   THIRD PARTY RELEASE ...........................................................................................34
F.   SUBSEQUENT DISCOVERY OF FACTS DOES NOT AFFECT ENFORCEABILITY OF RELEASES ....34

**ARTICLE X. RETIREE BENEFITS** ........................................................................................**36**

ii

**ARTICLE XI. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL..36**

**ARTICLE XII. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS...........36**

    A.    RETENTION OF JURISDICTION ...............................................................................36
    B.    MISCELLANEOUS MATTERS ................................................................................38
        *1.*   *Headings.* ........................................................................................38
        *2.*   *Notices.* ...........................................................................................38
        *3.*   *Successors and Assigns.* .................................................................38
        *4.*   *Severability of Plan Provisions.* .....................................................39
        *5.*   *Term of Injunctions or Stays.* .........................................................39
        *6.*   *Entire Agreement.* ..........................................................................39
        *7.*   *Additional Documents.* ...................................................................39
        *8.*   *Inconsistencies.* ..............................................................................39

**ARTICLE XIII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ..........40**

    A.    CONDITIONS PRECEDENT TO PLAN CONFIRMATION .................................................40
    B.    CONDITIONS PRECEDENT TO PLAN EFFECTIVENESS ...............................................40
    C.    EFFECT OF NON-OCCURRENCE OF CONDITIONS TO EFFECTIVE DATE .......................40

**ARTICLE XIV. EFFECT OF CONFIRMATION ..................................................40**

    A.    BINDING EFFECT OF CONFIRMATION ....................................................................40
    B.    GOOD FAITH ....................................................................................................40
    C.    NO LIMITATIONS ON EFFECT OF CONFIRMATION ...................................................41

**ARTICLE XV. MODIFICATION OR WITHDRAWAL OF PLAN ..........................41**

    A.    MODIFICATION OF PLAN .....................................................................................41
    B.    WITHDRAWAL OF PLAN ......................................................................................41

**ARTICLE XVI. SOLICITATION AND VOTING PROCEDURES ..........................41**

    A.    THE SOLICITATION PACKAGE ..............................................................................41
    B.    VOTING DEADLINE ............................................................................................42
    C.    VOTING INSTRUCTIONS ......................................................................................42
    D.    VOTING TABULATION .........................................................................................43

**ARTICLE XVII. VALUATION ANALYSIS AND FINANCIAL PROJECTIONS ..........44**

    A.    VALUATION OF THE COMPANY ...........................................................................44
        *1.*   *Overview.* ........................................................................................44
        *2.*   *Valuation Methodology.* ..................................................................46

**ARTICLE XVIII. CONFIRMATION PROCEDURES .................................................51**

    A.    THE CONFIRMATION HEARING ...........................................................................51
    B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..............................51
        *1.*   *Best Interests of Creditors Test/Liquidation Analysis* ....................52
        *2.*   *Feasibility.* ......................................................................................54
        *3.*   *Acceptance by Impaired Classes* .....................................................54
        *4.*   *Confirmation Without Acceptance by All Impaired Classes.* ............55
    C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION ..............................56
    D.    DISCLAIMER ....................................................................................................56

**ARTICLE XIX. PLAN RELATED RISK FACTORS ................................................57**

    A.    GENERAL .........................................................................................................57
    B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS ....................................................57
        *1.*   *Parties in Interest May Object to Company's Classification of Claims and Interests* ............57
        *2.*   *Failure to Satisfy Vote Requirement* ................................................58

iii

3.   *The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan* ...................... *58*

4.   *The Company May Object to the Amount or Classification of a Claim* ..................................... *58*

5.   *Risk of Non-Occurrence of the Effective Date* ............................................................... *59*

C.   FINANCIAL INFORMATION; DISCLAIMER ................................................................ 59

D.   CERTAIN TAX MATTERS ..................................................................................... 59

E.   RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE ... 59

F.   LIQUIDATION UNDER CHAPTER 7 ......................................................................... 59

G.   SECURITIES RISK .............................................................................................. 60

**ARTICLE XX. SECURITIES LAW MATTERS** ...................................................... **60**

A.   PLAN SECURITIES ............................................................................................. 60

B.   ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN ............................... 61

1.   *Exemption from Registration* ............................................................................... *61*

2.   *Resales of Plan Securities; Definition of Underwriter* ................................................. *61*

**ARTICLE XXI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ...... **63**

1.   *U.S. Federal Income Tax Consequences to the Debtors* ................................................ *63*

2.   *Importance of Obtaining Professional Tax Assistance* ................................................. *65*

**ARTICLE XXII. ALTERNATIVES TO CONFIRMATION OF THE PLAN** ............... **65**

**ARTICLE XXIII. RECOMMENDATION** ................................................................ **66**

DOCS_SF:77216.21 70938-001

## EXHIBITS

EXHIBIT A     Prepackaged Joint Plan of Reorganization

EXHIBIT B     Financial Projections

EXHIBIT C     Liquidation Analysis

EXHIBIT D     ABL Term Sheet

i

## ARTICLE I.

## INTRODUCTION AND OVERVIEW

**A.**    **Introduction**

The Company is sending you this Disclosure Statement because the Company is asking you to vote to approve the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  This Disclosure Statement describes certain aspects of the Plan, including the treatment of the Holders of the Claims and Interests, and also describes certain aspects of the Company's operations, financial projections, and other related matters.

The Plan that the Company describes in this Disclosure Statement provides for the reorganization of the Company's capital structure and treatment and satisfaction of all Claims against, and Interests in, the Debtors.  Specifically, the Plan provides for (1) ownership of 100% of the New Equity Interests in Reorganized Premier by the Holders of the First Lien Credit Agreement Claims, (2) the implementation of an ABL Facility,[2] which along with Reorganized Premier's existing cash, will be used to pay postconfirmation operating expenses and fund payments required to be made under the Plan; (3) provided that there is sufficient availability under the ABL Facility to fund Reorganized Premier's postconfirmation operating expenses, at the election of the Holders of First Lien Credit Agreement Claims, either (a) pro rata distribution to the Holders of First Lien Credit Agreement Claims from borrowings under the ABL Facility in an amount such that Reorganized Premier will have availability of $20 million under the ABL Facility for Reorganized Premier's post-effective date operating expenses after such distribution is made (the "First Lien Credit Agreement Lenders' Cash Payment"), or, alternatively, (b) issuance by Reorganized Premier of a note in the amount equal to the First Lien Credit Agreement Lenders' Cash Payment, or such lesser amount as may be agreed to by the First Lien Lenders, which note shall accrue interest at 6% payable at maturity, shall be prepayable by Reorganized Premier, and shall be secured by Liens on all the assets of the Reorganized Premier, junior only to the Liens under ABL Facility, in each case to be allocated among the Holders of the First Lien Credit Agreement Claims as specified in the Plan; (4) the dissolution of Holdings and the cancellation and extinguishment of all Existing Membership Interests in Holdings; (5) the substantial deleveraging of the Company's obligations through satisfaction of the First Lien Credit Agreement Claims as described above; and (6) fully discharging the Second Lien Credit Agreement Claims and General Unsecured Claims, none of which will receive any distributions under the Plan.

The Company believes such a restructuring will significantly strengthen its financial position and enhance its ability to sustain current operations as a viable going concern, as reorganized.

The Company is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of Holders of Class 3(B) First Lien Credit Agreement Claims entitled to vote to accept or reject the Plan or object to Confirmation.  Nothing in this Disclosure Statement may be used by any Entity for any other purpose.

---

[2] A copy of the term sheet of the proposed ABL Facility is annexed hereto as **Exhibit D**.

All exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.

Your vote on the Plan is important. Absent acceptance of the Plan, there likely will be protracted delays or a Chapter 7 liquidation. These alternatives may provide for a lesser recovery to holders of Allowed First Lien Credit Agreement Claims than the Plan does. **Accordingly, the Company recommends that you accept the Plan by completing and returning the enclosed ballot(s) no later than August 23, 2011, by 4:00 p.m. Eastern time.**

This Disclosure Statement summarizes certain provisions of the Plan, certain other documents, and certain financial information. The Company believes that these summaries are fair and accurate in all material respects; however, you should read the Plan in its entirety. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information to be incorporated herein by reference, the Plan, or such other documents, as applicable, shall govern for all purposes.

B.    **Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR

2

INACCURATE.  HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE
THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL
INSOLVENCY COUNSEL TO THE DEBTORS.  PSZ&J HAS RELIED UPON
INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION
OF THIS DISCLOSURE STATEMENT.  ALTHOUGH PSZ&J HAS PERFORMED CERTAIN
LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS
DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL
OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE
CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR
INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND
ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR
HER CLAIM.

## C.    Purpose and Effect of the Plan for Voting and for Distribution Purposes

The primary purpose of the Plan is to effectuate the restructuring and substantial de-
leveraging of the Company's capital structure in order to bring it into alignment with the
Company's present and future operating prospects and to provide the Company with greater
liquidity.  The Plan will allow the Company to continue its business in the ordinary course and
gives Holders of Class 3(B) First Lien Credit Agreement Claims 100% of the equity of
Reorganized Premier plus the First Lien Credit Agreement Lenders' Payment in exchange for the
cancellation of the First Lien Credit Agreement and the discharge of obligations owed
thereunder.  Holders of Second Lien Credit Agreement Claims and General Unsecured Claims
shall not receive any distributions on account of such Claims and such holders are presumed to
reject the Plan.  The Existing Membership Interests in Holdings shall be cancelled, such holders
will not receive any distributions on account of such interests, and Holdings shall be deemed
dissolved on the Effective Date.  Presently, based on the current outlook, the funds expected to
be generated by the Company's operation or other sources will not be sufficient to meet the
Company's current debt service requirements and satisfy its current debt obligations unless the
restructuring is consummated.  The Company believes that the restructuring will reduce
uncertainty with respect to its future and better position it to develop and maintain new
customers.

In connection with developing the Plan, the Company reviewed its current business
operations and compared its prospects as an ongoing business enterprise with the estimated
recoveries in various liquidation scenarios.  As a result, the Company concluded that the
Company's enterprise value would be maximized by continuing to operate as a going concern.
The Company believes that its businesses and assets have significant value that would not be
realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation
analysis described herein, the value of the Company's assets would be considerably greater if the
Company operates as a going concern instead of liquidating.  Moreover, the Company believes
that any alternative to Confirmation of the Plan, such as an out-of-court restructuring,
liquidation, or attempts by another party in interest to file a plan of reorganization, would result

3

in significant delays, litigation, and additional costs, and ultimately would diminsh the Company's enterprise value. Accordingly, the Company strongly recommends that you vote to accept the Plan if you are entitled to vote.

**D.**     **An Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a reorganization case also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a Chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a Chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the Chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

**E.**     **Plan Overview**

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. For classification and treatment of Claims and Interests, the Plan designates Classes of Claims and Classes of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

4

The following chart[3] briefly summarizes the classification and treatment of Claims and Interests under the Plan.  Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of seven Classes of Claims and/or Interests against each Debtor.  For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) Holdings, and (B) Premier.

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unknown | N/A | No | 100% |
| Unclassified | Priority Tax Claims | Unknown | N/A | No | 100% |
| 1 | Priority Non-Tax Claims | $200,000[4] | No | No | 100% |
| 2 | Other Secured Claims (if any)[5] | 0 | No | No | 100% |
| 3 | First Lien Credit Agreement Claims | $84,000,000 | Yes | Yes | 100% of New Equity Interests in Reorganized Premier plus either (i) the First Lien Credit Agreement Lenders' Cash Payment (ii) a 6 month note in the amount equal to the First Lien Credit Agreement Lenders' Cash Payment, or such lower amount as may be agreed by the First Lien Credit Agreement Lenders |
| 4 | Second Lien Credit Agreement Claims | $27,100,000 | Yes | No | 0% |
| 5 | General Unsecured Claims | $550,000 | Yes | No | 0% |
| 6 | Intercompany Claims | 0 | Yes | No | 0% |
| 7 | Existing Equity and Membership Interests | N/A | Yes | No | 0% |

F.    **Who May Vote on the Plan**

Each Holder of an Allowed Claim in Class 3(B) is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Class 3(B) Claims shall be counted

---

[3] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan.  References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[4] This amount represents two-weeks of paid time off that may accrue to Employees who become separated from the Debtors consistent with Company policy.  This amount may be higher to the extent an employee is entitled to any additional claims for vacation or paid time off to the extent so determined under applicable law.

[5] The Debtors do not believe any Class 2(A-B) Claims exist, but have created this class solely out of an abundance of caution.

in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.  An Impaired Class of Claims shall have accepted the Plan if:  (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Class 1(A-B) and Class 2(A-B) are each deemed to accept the Plan by operation of law and are not entitled to vote on the Plan.  The Holders of Claims in Class 3(A) and Classes 4(A-B), 5(A-B) and 6(A-B) and Holders of Interests in Class 7(A-B) shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote.  Because Class 3(A) and Classes 4(A-B), 5(A-B), 6(A-B) and 7(A-B) are deemed to reject the Plan by operation of law, the Debtors will request the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.  Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

Instructions for voting on the Plan are set forth below in Article XIV entitled "Solicitation and Voting Procedures."

G.    **Summary of Solicitation Package and Voting Instructions**

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate Ballot and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

Class 3(B) is entitled to vote to accept or reject the Plan and shall be served by email or with paper copies of this Disclosure Statement with all exhibits, including the Plan.  Any party who desires additional paper copies of these documents may request copies by writing to Kurtzman Carson Consultants LLC ("KCC") at 2335 Alaska Avenue, El Segundo, CA 90245, Telephone: (877) 573-3980 (the "Voting Agent").  All parties entitled to vote to accept or reject the Plan shall receive by email, or a paper copy of, each appropriate Ballot.

The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Class 3(B) First Lien Credit Agreement Claims are entitled to vote to accept or reject the Plan.  To be counted, Ballots cast by Holders must be received by the Voting Agent by 4:00 p.m. (prevailing Eastern Time) on **August 23, 2011**, the Voting Deadline.  Voting instructions are attached to each Ballot.

Unless the Company, in its discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted.  The Voting Agent will process and tabulate received

6

Ballots and will File a voting report (the "Voting Report") as soon as practicable on or after the Petition Date.

For answers to any questions regarding solicitation procedures, parties may contact the Voting Agent directly, at (877) 573-3980 or at ptlinfo@kccllc.com, with any questions related to the solicitation procedures applicable to their Claims and Interests.

The Plan Supplement will be Filed by the Debtors no later than seven days (unless otherwise ordered by the Bankruptcy Court)before the date fixed by the Bankruptcy Court to consider confirmation of the Plan (the "Plan Supplement Filing Date"). When Filed, the Plan Supplement will be available in both electronic and hard copy form. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest at the commencement of the Chapter 11 Cases.

**Any Ballot that is properly executed by the Holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 3(B) First Lien Credit Agreement Claim must vote all of its First Lien Credit Agreement Claim either to accept or reject the Plan and may not split its votes. By signing and returning a Ballot, each Holder of a First Lien Credit Agreement Claim in Class 3(B) will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such First Lien Credit Agreement Claim have been cast or, if any other Ballots have been cast with respect to such Class of First Lien Credit Agreement Claim, such other Ballots are revoked.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with the Ballot.**

**The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.**

**H.      Confirmation of the Plan**

      **1.      Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XV below.

      **2.      The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Following commencement of the Cases, the Company intends to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

### I.    Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Agent. Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of Article XV of the Plan.

Following Confirmation, the Plan will be consummated on the Effective Date, the day that is the first Business Day following the Confirmation Date on which: (1) no stay of the Confirmation Order is in effect; and (2) all conditions specified in Article XV of the Plan have been satisfied or waived pursuant to Article XV of the Plan.

For further information, see Article XV of the Plan, entitled "Conditions to Confirmation and Effectiveness."

### J.    Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in Article II of the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

### ARTICLE II.

### HISTORY, ORGANIZATION AND ACTIVITIES OF THE COMPANY

### A.    Business Operations

PTL Holdings LLC is a holding company, formed for the sole purpose of owning the capital stock of Premier, with no other business or operations. Premier is an operating company

8

in the semi-truck trailer rental and leasing business, headquartered in Grapevine, Texas. Premier offers short-term trailer rentals and long-term leases, including leases with purchase options. Premier also sells used semi-trailers and offers purchase and lease-backs of trailers as well as trailer maintenance services. Premier has a fleet of approximately 11,170 trailers, comprised predominantly of flatbeds and dry vans, 2,061 of which are leased or rented from Stoughton Trailers Acceptance Company LLC ("Stoughton"). Premier operates out of nineteen offices in fifteen different states in the United States. Premier's competitors include Aurora, GE Capital Trailer Fleet Services, Hale, McKinney, National Semi-Trailer, Star, Ryder and XTRA.

As of the date hereof, Premier had approximately 66 employees nationwide, 58 of whom are salaried and 8 of whom are paid hourly.

(a)    Products and Services

i.    Trailer Leases

Premier offers its customers long term leases on trailers ranging in duration from 1 to 7 years. Premier's leases allow its customers flexibility with respect to the trailers the customers lease, in some cases even allowing them to switch out a trailer mid-lease to a trailer with different specifications should the needs of the customer change. Further, Premier offers custom-designed maintenance programs as well as leases with a purchase option at the end of the lease term. Premier also sells used trailers to its customers. Premier's trailer lease customers generally remit payment on a monthly basis by check, credit card, automated transfer or wire. Long-term trailer leasing currently represents approximately 37% of Premier's business.

ii.    Short Term Rentals

In addition to long-term leases, Premier offers rentals on daily, weekly or monthly terms. These short term rentals provide Premier's customers the freedom of not having any specific time or equipment obligations. Such short term trailer rentals are designed to help customers manage temporary and seasonal demands and unexpected peak business periods, avoid fleet obsolescence, experiment with new equipment and replace out-of-service equipment. Premier also arranges for one-way moves for its customers with pre-approved drop off within Premier's branch network. Premier currently derives approximately 63% of its business through short-term trailer rentals.

(b)    The Stoughton Leases

Premier is a party to certain leases, encompassing approximately 1,849 trailers, with Stoughton (the "Stoughton Leases") that are available for lease or rent to Premier's customers. The Stoughton Leases require the Premier to make monthly payments in respect of the leased trailers. Premier has arranged for all of the Stoughton Leases to be paid together in one payment, made in the third week of each month. In addition to the Stoughton Leases, Premier also rents 213 additional trailers from Stoughton on a month-to-month basis.

**B.    Corporate History**

Holdings was formed in 2005 as a limited liability company by Angelo, Gordon & Co. ("Angelo Gordon") and Coda Capital, Inc. ("Coda") which as of the date hereof, was 100%

owned by affiliates of Angelo Gordon. Holdings is a holding company formed for the sole purpose of owning the majority of the capital stock of Premier, and has no operations and no assets other than its interests in Premier. Premier was incorporated on June 3, 2005. As of the date hereof, Holdings is wholly-owned by AG/Coda Trailer Investors LLC, an entity formed jointly by Angelo Gordon and Coda. Although the Debtors are headquartered in Grapevine, Texas, key members of management frequently travel to various of the Debtors' locations, and managerial and operating decisions generally are made at two primary locations: Grapevine, Texas and King of Prussia, Pennsylvania. Holdings controls approximately 92% of Premier's equity, the balance of which is held in various amounts by current and former officers and directors, who acquired their equity either through direct purchase or awards from Premier's 2005 Restricted Stock Plan.

C.    **Equity, Financing, and Significant Indebtedness**

(a)    Premier's First Lien Credit Facility

In order to finance Premier's trailer fleet and provide for ongoing working capital needs, at their inception in 2005 the Debtors, with Premier as borrower and Holdings as guarantor, entered into a senior secured credit revolving facility (the "First Lien Credit Agreement"), dated June 3, 2005, with Bank of America, N.A. ("BofA"), the CIT Group/Business Credit Inc. and Textron Financial Corporation (collectively, and including their respective successors and assigns, the "Lenders").[6] The First Lien Credit Agreement provides for a maximum borrowing capacity of $110 million, subject to a limitation on borrowing based on periodic appraisals of the Lenders' collateral. Currently, interest accrues on the First Lien Credit Agreement at the rate of Prime plus 2.5% per annum. The First Lien Credit Agreement is secured by first liens on substantially all of the Debtors' assets. The original lenders under the First Lien Credit Agreement were Bank of America, N.A., The CIT Group/Business Credit, Inc., and Textron Financial Corporation. Burdale Financial Limited ("Burdale") acquired the outstanding loan commitment and outstanding borrowings owed to CIT Group/Business Credit Inc. in October 2007. Affiliates of Garrison Investment Group ("Garrison") acquired the outstanding loan commitment and outstanding borrowings owed to lender Textron Financial Corporation in April, 2010. In April 2011 and in June 2011, Garrison acquired the outstanding loan commitment and outstanding borrowings owed under the First Lien Credit Agreement to BofA and Burdale, respectively. Accordingly, Garrison is the only current Lender under the First Lien Credit Agreement.

The First Lien Credit Agreement is an asset based revolver and letter of credit facility. As of the Petition Date, the total amount outstanding under the First Lien Credit Agreement was approximately $84 million.

On July 22, 2009, the Agent sent a letter to the Debtors pursuant to which the Agent agreed to forbear from exercising its remedies under the First Lien Credit Agreement so long as the Debtors agreed to permit the Lenders to retain an independent consultant, at the Debtors' expense, to review the Debtors' financial position and otherwise cooperate with the Agent in its

---

[6] BofA originally acted as Agent under the First Lien Credit Agreement. On April 20, 2011, BofA resigned as agent and was replaced by the current Agent, Garrison Loan Agency Services LLC, an affiliate of Garrison.

attempts to determine the proper direction for the Debtors' restructuring (the "Forbearance Letter"). The Debtors received additional extensions of the forbearance period which, as noted above, was extended to August 31, 2011.

      (b)   Premier's Second Lien Credit Agreement

In October 2007, the Debtors, with Premier as borrower and Holdings as guarantor, entered into a junior term loan agreement with Fifth Street Mezzanine Partners III, L.P. ("Fifth Street") as lender, for borrowings of $17.5 million (the "Second Lien Credit Agreement"). The Second Lien Credit Agreement matures on October 2012 and is secured by substantially all of the Debtors' assets, which loan is junior to the First Lien Credit Facility. Interest accrues on the Second Lien Credit Agreement at a rate of 16.5% per annum as long as certain financial covenants are complied with, as specified in the Second Lien Credit Agreement. The interest is payable monthly at 13.25% payable in cash, and the remaining 3.25% is added to the outstanding principal loan balance ("PIK Interest"). Fifth Street has a second lien on substantially the same collateral package provided to the Agent under the First Lien Credit Agreement. The default interest rate is 17.25% per annum exclusive of the 3.25% PIK Interest. Effective August 1, 2009, Premier ceased payment of the required monthly interest payments on the Second Lien Credit Agreement. Outstanding borrowings under the Second Lien Credit Agreement, inclusive of PIK Interest and unpaid interest, were approximately $27.1 million as of the Petition Date.

The Second Lien Credit Agreement contains a cross default provision that is triggered upon an event of default under the First Lien Credit Agreement. However, Fifth Street and the Lenders are parties to an intercreditor agreement, dated October 23, 2007 (the "Intercreditor Agreement") that limits Fifth Street's remedies with respect to the collateral. In August 2009, the Debtors ceased making payments on the Second Lien Credit Agreement, which has continued to accrue both cash pay and the PIK Interest, steadily increasing the total amount outstanding thereunder. Because of the Intercreditor Agreement, Fifth Street has been unable to exercise its rights and remedies under the Second Lien Credit Agreement

      (c)   Financial Performance

For the 2009 and 2010 fiscal years, Premier reported approximately $37,049,000 and $35,368,000 in total revenues, respectively, and net losses of approximately $9,225,000 and $11,745,000, respectively. As of June 30, 2011, Premier reported $18,266,000 in total revenues and net losses of $4,758,000.

**D.    Events Leading Up To the Proposed Restructuring**

    **1.    Effect of the Global Economic Recession**

From its founding in 2005 through mid-2008, Premier enjoyed rapid success, growing its business to the point where it controlled more than 13,000 trailers. When the economy fell into recession in late 2008, the trucking industry was severely affected. Faced with rising fuel costs and decreased demand for interstate shipping, monthly tonnage (a common measurement of the health of the trucking industry) fell by almost 15% from the year prior in November and December of 2008 and a significant number of trucking bankruptcies (more than 2,000 in 2008-2009 alone) occurred. The decrease in demand resulted in significant overcapacity in the trucking industry of trailers available to customers for lease or rent and, together with the

11

reduction in the available customer pools, caused a sharp decrease in trailer prices and a severe slowdown in Premier's business. Premier saw its business shift away from leases and towards short term rentals. According to a presentation prepared by the Debtors and delivered to the Lenders in July 2009, its revenue per rental unit fell by almost 9% and total utilization of its fleet fell by approximately 17% by mid-2009. All of these factors, taken together, negatively impacted the value of Premier's business.

**E.    Prepetition Marketing Efforts**

In early 2010, the Debtors retained Carl Marks Advisory Group ("Carl Marks") to analyze their business and assist in brokering a workable restructuring. In February 2010, the Debtors also retained Lazard Middle Market LLC ("Lazard") to assist in evaluating and marketing the Debtors' business and assets for a potential sale to a third party. Lazard prepared solicitation materials, set up a data room, identified 69 potential buyers and organized a road show in which the Debtors' management participated. As a result of their efforts, Lazard entered into non-disclosure agreements with 38 potential buyers, which resulted in the Debtors receiving 10 bids for their business.

Lazard, with the Company's assistance, identified and contacted 69 potential investors it believed might be interested in acquiring the Company. Lazard identified the potential investors based on a number of factors, including their known desire to invest in companies in the transportation and equipment leasing sector, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction. An initial diligence package containing a Confidential Information Memorandum detailing information on the Company's operations, industry, and historical and projected financial information was distributed to 38 interested parties who executed non-disclosure agreements. Additionally, parties were granted access to an electronic data room. Interested parties were invited to attend management presentations during March and April 2010 and management held multiple meetings with 12 interested parties. Following discussions with senior management and the initial diligence package, investors were invited to submit non-binding indications of interest. The Company received non-binding term sheets from 10 interested parties, including one strategic bidder. Each of these bids was subject to legal, business and financial due diligence as well as other conditions precedent. After subsequent diligence and discussions with Lazard, interested parties were invited to submit revised bids. At that time, the Company received non-binding term sheets (or affirmation of previous bid) from 7 interested parties. However, the Lenders and the Company found that the consideration proposed in the bids was not sufficient, and formal efforts to sell the Debtors' business were terminated in June 2010. Subsequently, in September 2010, the Company received an unsolicited bid from a sponsor-backed strategic buyer; however, the purchase price offered was below the range of other bids received. The price was deemed unacceptable by the Lenders, and the Company did not accept the bid.

Following the conclusion of the sale process, the Debtors' negotiated with their Lenders for a potential Lender-led restructuring transaction. The Debtors proposed for the Lenders to provide an infusion of additional liquidity to grow the business and to repay the Lenders either through growth of the Debtors' business or a sale of the business in a more favorable economic climate. The Lenders were unwilling to provide a capital infusion in an amount the Debtors believed necessary to accomplish the Lenders' goals, the Debtors proposed alternative structures

12

involving third party financing. A meeting was held and term sheet delivered by the Debtors to the Lenders in early September of 2010 proposing a transaction designed to allow the Lenders to recover a significant portion of their debt and the Debtors to receive needed liquidity through a third party. The Lenders and the Debtors exchanged term sheets, and several negotiation sessions were held during the fall of 2010. However, these negotiations were ultimately unsuccessful.

Commencing in January 2011, the Lenders advised the Debtors that they had engaged advisors to analyze the Debtors' operations and prepare for an orderly wind-down of the Debtors' business. In mid-April 2011, BofA sold its position in the First Lien Credit Agreement to affiliates of Garrison and resigned in its capacity as Agent under the First Lien Credit Agreement. Following Garrison's acquisition of Burdale's position in the First Lien Credit Agreement on June 7, 2011 (thereby leaving Garrison as the sole Lender under the First Lien Credit Facility), the Debtors and Garrison shifted discussions away from a liquidation and wind-down of the Debtors' operations and focused on negotiating a restructuring of the Debtors' indebtedness that would allow the Debtors to emerge and continue as going concern upon the effectiveness of the proposed Plan.

## F.    **Anticipated Events of the Chapter 11 Cases**

### 1.    **Expected Timetable of the Chapter 11 Cases**

The Company expects the Cases to proceed quickly. The Company cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Company. On the Petition Date, the Company will promptly request that the Bankruptcy Court set a hearing date to both approve this Disclosure Statement and to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be shortly after the date the Bankruptcy Court enters the Confirmation Order and all of the conditions to the occurrence of the Effective Date are either satisfied or waived. The Company will attempt, as soon as practicable, to emerge from protection under chapter 11.

### 2.    **First Day Relief**

In order to facilitate the Cases and minimize disruption to the Company's operations, the Company intends to present motions to the Bankruptcy Court on the Petition Date seeking certain relief including, but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Cases.

(a)    Approval of Solicitation Procedures and Scheduling of Combined Disclosure Statement Approval and Confirmation Hearing

To expedite the Cases, the Company intends to seek an immediate order setting a date for a combined hearing to (i) approve the Solicitation, and (ii) approve the adequacy of the Disclosure Statement and confirm the Plan. The Company will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearings.

(b)    Use of Cash Collateral and Debtor in Possession Financing

The Company will require the use of the cash collateral of their secured lenders in order to operate efficiently and may require a postpetition debtor in possession financing facility of up to $1.5 million. Accordingly, the Company will seek an order of the Bankruptcy Court authorizing the Company to use cash collateral to obtain postpetition financing on an interim and final basis pursuant to agreed terms negotiated with the Lenders.

(c)    Employees

The Company will seek authority to pay employee compensation and, additionally, the Company intends to continue all prepetition benefit programs, including, among other things, the medical, dental and 401(k) plans to the extent applicable. This relief will allow the Company to maintain employee morale and prevent costly distractions and retention issues.

(d)    Use of Existing Cash Management System

The Company will seek authority to maintain its prepetition cash management systems after commencement of the Cases, including intercompany transfers and use of bank accounts. This facilitates the efficient operation of the Company by not requiring it to shut down its existing accounts and needlessly create an identical system for each Debtor for the limited duration of the Cases.

(e)    Utilities

The Company will move the Court on the Petition Date to enter orders approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Company is not required to provide any additional adequate assurance pending entry of a Final Order. The Company believes that uninterrupted utility services are essential to the Company's ongoing operations and, therefore, to the success of the Company's reorganization.

(f)    Applications to Employ Professionals

The Company will also apply for orders authorizing the Company to employ Pachulski Stang Ziehl & Jones LLP as the Company's bankruptcy counsel and Lazard as the Company's financial advisors.

## ARTICLE III.

## DESCRIPTION OF THE PLAN

THE FOLLOWING SUMMARY OF CLASSIFICATIONS OF CLAIMS AND INTERESTS AND THE DISTRIBUTIONS UNDER THE PLAN IS SUBJECT, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE, TO THE PLAN.

A.    **Treatment of Unclassified Claims**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

1.    **Administrative Claims**

Payment of Allowed Administrative Claims, excluding Professional Fee Claims, shall be made by Reorganized Premier in the ordinary course of business when such claims become due. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Cases. Creditors should not file with the Bankruptcy Court any requests for payment of any Administrative Claims.

2.    **Priority Tax Claims**

Each Allowed Priority Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, (i) be paid in full in Cash, without interest, by Reorganized Premier, on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; or (d) such date as the holder of such Claim and Reorganized Premier may agree, or (ii) receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code, with interest on the unpaid portion of such Claim at the statutory rate under applicable nonbankruptcy law or at a rate to be agreed upon by the Debtors or Reorganized Premier and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; *provided, however,* that Reorganized Premier may prepay any or all such Claims at any time, without premium or penalty. For the purpose of option (ii), the payment of each Allowed Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first Business Day following the end of the first full calendar quarter following the Effective Date, (ii) the first Business Day following the end of the first full calendar quarter following the date an order allowing such Claim becomes a Final Order, or (iii) such other time or times as may be agreed with the holder of such Claim. Each installment shall include simple interest on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed or determined under option (ii).

3.    **Claims for Professional Fees**

Each Professional seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before sixty (60) days from the Effective Date; and (b) if the Bankruptcy Court grants such an award, each such Professional will be paid in full in Cash by Reorganized Premier in such amounts as are allowed by the Bankruptcy Court upon such allowance or as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the

15

Confirmation Order. The fees and expenses of Professionals incurred on and after the Effective Date shall be paid by Reorganized Premier without further notice or approval by the Bankruptcy Court.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes. Article III of the Plan describes the treatment of Administrative Claims and Priority Tax Claims.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest qualifies within the description of such Class and is in a different Class to the extent that it qualifies within the description of such different Class, but the same portion of a Claim may not be in more than one Class in relation to a particular Debtor. A Claim or Interest is also placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of seven Classes of Claims and/or Interests against each Debtor. For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) Holdings, and (B) Premier.

**B.**    **Treatment of Classified Claims and Interests**

    **1.**    **Classes 1(A-B) – Priority Non-Tax Claims.**

        (a)    <u>Classes 1(A-B) consist of all Priority Non-Tax Claims.</u>

        (b)    <u>Treatment:</u>  The Debtors do not believe there are any Class 1(A) Priority Non-Tax Claims against Holdings and any such Claims are Disputed Claims. Except to the extent that a Class 1(A-B) Holder of a Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Priority Non-Tax Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement or policy that governs such Priority Non-Tax Claim, whichever is later, each Holder of such Class 1(A-B) Priority Non-Tax Claim shall be paid in full in Cash by Reorganized Premier or otherwise receive such treatment as to render such holder Unimpaired.

        (c)    <u>Voting:</u>  Classes 1(A-B) are Unimpaired Classes and Holders of Classes 1(A-B) Priority Non-Tax Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.      **Classes 2(A-B) – Other Secured Claims.**

(a)     Classes 2(A-B) consist of all Other Secured Claims.

(b)     Treatment:  The Debtors do not believe that there are any Class 2(A-B) Other Secured Claims.  All Class 2(A-B) Other Secured Claims, if any, are Disputed Claims.  At the sole option of the Debtors, each Holder of an Allowed Class 2(A-B) Other Secured Claim, if any, shall receive one of the following treatments: (i) the Holder of such Class 2(A-B) Other Secured Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Class 2(A-B) Other Secured Claim; or (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Class 2(A-B) Other Secured Claim, or as otherwise agreed between the holder of such claim and the Debtors, the Holder of a Class 2(A-B) Other Secured Claim will receive a Cash payment equal to the amount of its Class 2(A-B) Other Secured Claim in full satisfaction, release, and discharge of such claim; or (iii) the legal, equitable and contractual rights to which a Class 2(A-B) Other Secured Claim entitles the Holder shall be unaltered by the Plan; or (iv) the Holder of a Class 2(A-B) Other Secured Claim shall receive the treatment described in Section 1124(2) of the Bankruptcy Code.

(c)     Voting:  Classes 2(A-B) are Unimpaired Classes and Holders of Class 2(A-B) Other Secured Claims, if any, are not entitled to vote on the Plan.

3.      **Classes 3(A-B) – First Lien Credit Agreement Claims.**

(a)     Classes 3(A-B) consist of all First Lien Credit Agreement Claims.

(b)     Treatment of Class 3(A) First Lien Credit Agreement Claims:  Class 3(A) First Lien Credit Agreement Claims shall not receive any distributions on account of such Class 3(A) First Lien Credit Agreement Claims.

(c)     Treatment of Class 3(B) First Lien Credit Agreement Claims:  On the Effective Date, in full and final satisfaction, settlement, release, and discharge of all Class 3(B) First Lien Credit Agreement Claims, all Class 3(B) First Lien Credit Agreement Claims shall be indefeasibly satisfied through the distribution by the Debtors to each Holder of a First Lien Credit Agreement Claim or its designee as follows:

      (i)     with respect to $32.5 million of Allowed First Lien Credit Agreement Claims, representing the then-outstanding balance of the borrowing by the Debtor under the First Lien Credit Agreement as of June 3, 2006, New Equity Interests with a value that bears the same ratio to the sum of the value of 100% of the New Equity Interests and the First Lien Credit Agreement Lenders' Payment as the $32.5 million of Allowed First Lien Credit Agreement Claims

17

specified above, bears to the total Allowed First Lien Credit Agreement Claims;

(ii)    with respect to the remaining amount of the Allowed First Lien Credit Agreement Claims in excess of the $32.5 million amount referred in Section III.B.3.(c)(i) of this Disclosure Statement, the balance of the New Equity Interests and all of the First Lien Credit Agreement Lenders' Payment.

(d)    <u>Voting</u>: Classes 3(A-B) are Impaired Classes.  Holders of Class 3(A) First Lien Credit Agreement Claims are deemed to reject the Plan and are not entitled to vote thereon.  Holders of Class 3(B) First Lien Credit Agreement Claims are impaired and are entitled to vote to accept or reject the Plan.

4.    **Classes 4(A-B) – Second Lien Credit Agreement Claims.**

(a)    <u>Classes 4(A-B) consist of all Second Lien Credit Agreement Claims.</u>

(b)    <u>Treatment of Class 4(A) Second Lien Credit Agreement Claims</u>:  Class 4(A) Second Lien Credit Agreement Claims shall not receive any distributions on account of such Class 4(A) Second Lien Credit Agreement Claims.

(c)    <u>Treatment of Class 4(B) Second Lien Credit Agreement Claims</u>:  Holders of Second Lien Credit Agreement Claims in Class 4(B) will not receive any distributions on account of such claims.  On the Effective Date, the Second Lien Credit Agreement Claims shall be extinguished and discharged and the Second Lien Credit Agreement shall be of no further force or effect.

(d)    <u>Voting</u>: Classes 4 (A-B) are Impaired Classes and Holders of Class 4 (A-B) Second Lien Credit Agreement Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.    **Classes 5 (A-B) – General Unsecured Claims.**

(a)    <u>Classes 5 (A-B) consist of all General Unsecured Claims.</u>

(b)    <u>Treatment of Class 5(A) General Unsecured Claims</u>:  Class 5(A) General Unsecured Claims shall not receive any distributions on account of such Class 5(A) General Unsecured Claims.

(c)    <u>Treatment of Class 5(B) General Unsecured Claims</u>:  Holders of General Unsecured Claims will not receive any distributions on account of such claims.  On the Effective Date, all General Unsecured Claims shall be extinguished and fully discharged.

(d)    <u>Voting</u>: Classes 5 (A-B) are Impaired Classes and Holders of Class 5(A-B) General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

18

6.    **Classes 6 (A-B) – Intercompany Claims.**

(a)    <u>Classes 6(A-B) consist of all Intercompany Claims.</u>

(b)    <u>Treatment of Class 6(A) Intercompany Claims:</u>  Class 6(A) Intercompany Claims shall not receive any distributions on account of such Class 6(A) Intercompany Claims.

(c)    <u>Treatment of Class 6(B) Intercompany Claims:</u>  Holders of Class 6(B) Intercompany Claims will not receive any distributions on account of such claims. On the Effective Date, all Class 6(B) Intercompany Claims held by Holdings against Premier shall be extinguished and fully discharged.

(d)    <u>Voting:</u>  Classes 6(A-B) are Impaired Classes and Holders of Class 6(A-B) Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

7.    **Classes 7(A-B) – Existing Equity and Membership Interests**

(a)    <u>Classes 7(A-B) consist of all Existing Equity and Membership Interests.</u>

(b)    <u>Treatment:</u>  On the Effective Date, all Existing Equity Interests in Premier and all Existing Membership Interests in Holdings shall be deemed cancelled. Holders of Existing Equity and Membership Interests shall not receive any property or any distribution under the Plan on account of such interests.

(c)    <u>Voting:</u>  Classes 7(A-B) are Impaired Classes and Holders of Class 7(A-B) Existing Equity and Membership Interests are conclusively deemed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

C.    <u>**Full Satisfaction, Discharge and Release**</u>

The payments, distributions, grant of entitlements and other treatment, including cancellation, discharge and/or extinguishment without consideration or distribution, afforded to Holders of Allowed Claims and Interests against Premier under Article V of the Plan shall be in full and complete satisfaction, discharge and release of and in exchange for such Allowed Claims or Interests.

**ARTICLE IV.**

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(f) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the Plan.

19

**A.**    <u>**Voting Class**</u>

Class 3(B) is Impaired under the Plan and Holders of Claims in Class 3(B) are entitled to vote to accept or reject the Plan.

**B.**    <u>**Presumed Acceptance of Plan**</u>

Class 1(A-B) and Class 2(A-B) are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**C.**    <u>**Presumed Rejection of the Plan**</u>

Class 3(A) and Classes 4(A-B), 5(A-B), 6(A-B) and 7(A-B) are Impaired and shall receive no distributions under the Plan and are, therefore, each deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**D.**    <u>**Confirmation of The Plan Pursuant to**</u>
       <u>**Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**</u>

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires any such modification.

**E.**    <u>**Controversy Concerning Impairment**</u>

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or prior to the Confirmation Date.

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

The Plan shall be implemented on the Effective Date. In addition to the provisions set forth elsewhere in the Plan regarding means of execution, the following shall constitute the principal means for the implementation of the Plan.

**A.**    <u>**Sources of Cash for Plan Distributions**</u>

All consideration necessary to fund any payments on behalf of the Debtors pursuant hereto shall be obtained from the ABL Facility and Cash from Reorganized Premier, including Cash from Reorganized Premier's business operations.

20

**B.**    **Issuance of New Equity Interests in Reorganized Premier**

On the Effective Date, the Holders of Allowed First Lien Credit Agreement Claims, or their designee, shall acquire 100% of the New Equity Interests as set forth in Article V, Section A(3)(c) in accordance with the terms of the Plan without further act or action under applicable law, regulation, rule or order.  On the Effective Date, Holdings shall be deemed to be dissolved for all purposes without further act or action under applicable law, regulation, rule or order and any assets of Holdings, including any causes of action, shall be transferred to Reorganized Premier.

Except as otherwise provided by the Plan, the issuance of the New Equity Interests, Equity Grant and Management Options are authorized in accordance with the Plan, without any further action by Holders of Class 3(B) First Lien Credit Agreement Claims.  All of the shares of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth therein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Holders of Existing Equity and Membership Interests will not receive any distributions or retain any property or interest under the Plan on account of such Interests.

**C.**    **Securities Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Equity contemplated by the Plan and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities.  In addition, under section 1145 of the Bankruptcy Code, any New Equity Interests issued in accordance with the Plan and any and all agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions on the transferability of such securities and instruments; and (4) applicable regulatory approval.

**D.**    **Powers of Reorganized Premier**

On the Effective Date, Reorganized Premier shall be authorized to undertake and implement the transactions described in the Plan, including the execution of such other and further documents, as are necessary or appropriate to implement the Plan.  Reorganized Premier will be the entity under the Plan that is exclusively responsible for paying all Allowed Claims entitled to receive a distribution pursuant to the Plan.

For purposes of the Plan, and subject to its obligations under the Plan, Reorganized Premier is not intended as, and is not in fact, a substitute for or a successor to either of the Debtors in any way whatsoever.

E.     **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan, (A) the obligations of the Debtors under (1) the First Lien Credit Agreement, (2) the Second Lien Credit Agreement, and (3) any other note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated or assumed pursuant to the Plan), shall be discharged and neither the Debtors nor Reorganized Premier shall have any continuing obligations thereunder; and (B) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors (other than those obligations that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however*, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan to the extent and as provided therein.

From and after the Effective Date, the Agent and the Second Lien Credit Agreement Lender shall, at the expense of Reorganized Premier, (1) deliver to Reorganized Premier (and, if necessary, execute) any Uniform Commercial Code termination statements, lien releases, mortgage releases, terminations of patent and trademark security agreements, discharges of security interests, and other similar discharge or release documents (and if applicable, in recordable form) as are prepared by Reorganized Premier and are reasonably necessary to release, as of record, the security interests, financing statements, and all other notices of security interests and liens previously filed by the Agent, any First Lien Credit Agreement Lender or the Second Lien Credit Agreement Lender, against any of the Debtors with respect to the First Lien Credit Agreement and the Second Lien Credit Agreement (collectively, the "Lender Releases"), and (2) authorize Reorganized Premier to prepare and file the Lender Releases on behalf of the Agent, the First Lien Credit Agreement Lenders, and the Second Lien Credit Agreement Lender, respectively.  If such Lender Releases require execution by the Agent, any First Lien Credit Agreement Lenders or the Second Lien Credit Agreement Lender, as applicable, such party shall promptly execute any of the aforementioned documents which are reasonably deemed necessary by Reorganized Premier to release the Agent's, or any First Lien Credit Agreement Lender's or the Second Lien Credit Agreement Lender's liens and security interests in the assets of Reorganized Premier or Holdings.

F.     **Exit Facility**

On the Effective Date, Reorganized Premier shall be authorized to enter into the ABL Facility.  The terms of the ABL Facility shall be subject to the terms, provisions and conditions of documentation acceptable to the Debtors, the Agent, Reorganized Premier, and the ABL Lenders.  Subject to any limitations under the ABL Facility, Reorganized Premier shall be authorized to (i) enter into the ABL Facility, (ii) grant any liens, and security interests and incur or guaranty the indebtedness provided by the ABL Facility, respectively, and (iii) issue, execute, deliver and perform all documents, instruments and agreements necessary or appropriate to

22

implement and effectuate all obligations under the ABL Facility, and to take all other actions necessary or appropriate to implement and effectuate the borrowings under the ABL Facility.

**G.     New Charter Documents**

On or before the Effective Date, Reorganized Premier shall file their applicable Charter Documents with the applicable Secretary of State and/or other applicable authorities in accordance with the corporate laws of the state of incorporation. Reorganized Premier may amend and restate any new certificates of incorporation, amend and restate new by-laws and other constituent documents as permitted by the laws of the state of incorporation and their new certificate of incorporation, new membership agreements, and/or new by-laws.

**H.     Directors and Officers of Reorganized Premier**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the directors of the Reorganized Premier Board shall consist of certain directors, each of whom shall be selected by the Agent. The directors of Reorganized Premier, and the proposed officers of Reorganized Premier shall be identified in the Plan Supplement.

Each of the directors and officers of Reorganized Premier shall serve in accordance with applicable non-bankruptcy law and Reorganized Premier's Charter Documents, as the same may be amended from time to time. From and after the Effective Date, the directors and officers of Reorganized Premier shall be selected and determined in accordance with the provisions of applicable law and Reorganized Premier's Charter Documents.

Upon the Effective Date, and without any further action by the shareholders, directors and officers of the Debtors, Reorganized Premier's Charter Documents shall be deemed amended (a) to the extent necessary, to incorporate the provisions of the Plan, and (b) to prohibit the issuance by Reorganized Premier of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such Charter Documents as permitted by applicable law.

**I.     Equity Grant, and Issuance of Management Options**

On the Effective Date or as soon as practicable thereafter, the Reorganized Premier will adopt and implement the terms of the Equity Grant and the issuance of the Management Options and subject, in all respects, to the following terms and conditions set forth in the Plan unless otherwise agreed by Reorganized Premier and the applicable Entities:

Issuances made under the Management Options and Equity Grants will dilute the interests of the common stockholders of Reorganized Premier. In connection with the issuance of the Management Options and Equity Grants to employees of the Debtors, Reorganized Premier may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the Reorganized Premier stock and/or options and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security, and Medicare taxes.

**J.**     <u>**Revesting of Assets in Reorganized Premier**</u>

Upon the Effective Date, Reorganized Premier shall be vested with all right, title and interest in the respective Assets of its Estate, and of the Estate of Holdings and such property shall become the property of Reorganized Premier free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as expressly set forth in the Plan.

**K.**     <u>**Corporate Transactions**</u>

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized Premier shall take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of restructuring, disposition or transfer containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation or any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate membership interests, certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**L.**     <u>**Corporate Action**</u>

Each of the matters provided for by the Plan involving the corporate structure of Reorganized Premier, or corporate or related actions to be taken by or required of Reorganized Premier shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity.

**M.**     <u>**Effectuating Documents; Further Transactions**</u>

On and after the Effective Date, Reorganized Premier and its respective officers, directors and members are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of Reorganized Premier, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**N.**     <u>**Exemption from Certain Taxes and Fees**</u>

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from any of the Debtors to Reorganized Premier pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (2) the creation, modification, consolidation, or recording of any

24

mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recoding of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## O.    Employee and Retiree Benefits

Except as required under the Plan, on and after the Effective Date, Reorganized Premier (1) may honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or the Debtors' pleadings filed on the Petition Date, for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) will honor, in the ordinary course of business, accrued, but unpaid Claims of employees employed by Reorganized Premier as of the Effective Date for accrued vacation time or similar Claims for accrued paid time off arising prior to the Petition Date in accordance with the terms of the Plan; *provided, however,* that Reorganized Premier's performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the plan shall limit, diminish, or otherwise alter the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

## P.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released including, for the avoidance of doubt, Avoidance Actions and the releases by the Debtors provided in Article XI of the Plan, Reorganized Premier shall acquire and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and Reorganized Premier's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Reorganized Premier may pursue such Causes of Action, as it determines to be appropriate. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that Reorganized Premier will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the releases by the Debtors pursuant to the Plan or otherwise), the Debtors and

25

Reorganized Premier expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized Premier expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan. Reorganized Premier may, in its sole discretion, prosecute, compromise, settle or dispose of any and all Causes of Action without further notice or approval by the Bankruptcy Court.

Q.     **Discharge of Premier**

Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against Premier or any of its assets or properties. Regardless of whether property shall have been distributed or retained pursuant to the Plan on account of such Claims, upon the Effective Date, Premier shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan.

R.     **Debtors' Releases**

Notwithstanding anything to the contrary in the Plan, the failure of the Court to approve any of the provisions set forth in Section 11.C, D or E of the Plan shall not constitute a failure of any condition to ether confirmation or the effectiveness of the Plan.

S.     **United States Trustee Fees**

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date. Thereafter, Reorganized Premier shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the Cases.

T.     **Subordination**

Pursuant to section 510(a) of the Bankruptcy Code, nothing herein shall be deemed to limit the enforceability of any subordination agreement or intercreditor agreement, including, without limitation, the Intercreditor Agreement, that is otherwise enforceable under applicable nonbankruptcy law. Accordingly, any distributions made hereunder will be made subject to any enforceable subordination or intercreditor agreement known to the Debtors. Creditors that are parties to any such enforceable subordination or intercreditor agreements (other than the Intercreditor Agreement) shall notify the Debtors of their existence in advance of the Effective Date and shall provide the Debtors with copies of such agreements, or identify such agreements

if they are already in the Debtors' possession.  Failure to do so shall be deemed a waiver of such rights.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in the plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and Reorganized Premier shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by Reorganized Premier under the Plan shall be in full and final satisfaction, settlement and release of all Claims against Reorganized Premier.

### B.    Disbursing Agent

Except as provided therein, all distributions under the Plan shall be made by Reorganized Premier as Disbursing Agent, or by such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date.  Reorganized Premier, or such other Entity designated by the Debtors, shall not be required to give any bond or surety or other security for the performance of Reorganized Premier's duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

C.      **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of Reorganized Premier, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

D.      **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

E.      **Distributions on Account of Claims Allowed After the Effective Date**

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made upon the Distribution Date. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim). Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

1.      **General Distribution Procedures.**

Reorganized Premier, or any other duly appointed Disbursing Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All cash and other property held by Reorganized Premier for distribution under the Plan not be subject to any claim by any Person, except as provided under the Plan.

2.      **Address for Delivery of Distributions.**

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Cases), or (2) at the addresses set forth in any written notices of address change delivered to the Debtors.

3.      **Undeliverable Distributions and Unclaimed Property.**

If the distribution to the Holder of any Allowed Claim is returned to Reorganized Premier as undeliverable, no further distribution shall be made to such Holder, and Reorganized Premier shall have no obligation to make any further distribution to the Holder, unless and until Reorganized Premier is notified in writing of such Holder's then current address.

Any Entity which fails to claim any cash within one year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Entities which fail to claim cash shall forfeit their rights thereto and shall have no claim

28

whatsoever against the Debtors or Reorganized Premier or against any Holder of an Allowed Claim to whom distributions are made by Reorganized Premier.

4.    **Withholding Taxes.**

Pursuant to section 346(f) of the Bankruptcy Code, Reorganized Premier shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, Reorganized Premier shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes.  As a condition to receiving any distribution under the Plan, Reorganized Premier may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for Reorganized Premier to comply with applicable tax reporting and withholding laws.

5.    **Setoffs.**

Reorganized Premier may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature (other than claims arising under chapter 5 of the Bankruptcy Code) that Reorganized Premier may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Premier of any such claims, rights and causes of action that Reorganized Premier possesses against such Holder.

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

A.    **No Filing of Proofs of Claim**

Except as otherwise provided under the Plan, Holders of Claims shall not be required to file a proof of claim and no parties should file a proof of claim.  Unless disputed by the Holder of a Claim, the amount set forth in the applicable Debtor's books and records shall constitute the Allowed amount of such Holder's Claim.  If the Holder of a Claim disagrees with the Debtors' books and records with respect to the Allowed Amount of such Holder's Claim, such Holder must advise Reorganized Premier in writing, in which event the Claim will become a Disputed Claim.  Reorganized Premier intends to attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court.  Nevertheless, Reorganized Premier may, in its discretion, file with the Bankruptcy Court an objection to the allowance of such Claim or any other appropriate motion or adversary proceeding with respect thereto.  All such objections shall be litigated to Final Order, provided however, that Reorganized Premier, may compromise, settle, withdraw or resolve any objections to Claims without further order of the Bankruptcy Court.

29