**B.**     **Disputed Claims**

All objections to Claims shall be filed and served not later than one-hundred-twenty (120) days following the Effective Date; provided, however, such date may be extended by the Bankruptcy Court beyond such one-hundred-twenty (120) days upon motion filed by Reorganized Premier prior to the expiration of the above-noted 120 day deadline. The filing of a motion to extend the deadline to object to any Claims shall automatically extend such deadline until a Final Order is entered on such motion. In the event that such motion to extend the deadline to object to Claims is denied by the Bankruptcy Court, such deadline shall be the later of the current deadline (as previously extended, if applicable) or 30 days after the Bankruptcy Court's entry of an order denying the motion to extend such deadline. Unless otherwise provided in the Confirmation Order, Reorganized Premier is authorized to settle, or withdraw any objections to, any Disputed Claim following the Effective Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan. Under no circumstances will any distributions be made on account of Disallowed Claims.

**C.**     **Procedures Regarding Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation between the Debtors and the Holder of the Claim. No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

The Debtors (prior to the Effective Date) or Reorganized Premier (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan shall irrevocably constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim. Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors or Reorganized Premier in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount.

**D.**     **Allowance of Claims**

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, Reorganized Premier shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable.

# ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except for any executory contracts or unexpired leases:  (i) that are listed as Rejected Contracts in the Plan Supplement; (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to sections 365 and 1123 of the Bankruptcy Code; or (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed assumed by Reorganized Premier pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  It is anticipated that the terms of certain employment agreements between Premier and certain of Premier's employees may be modified as agreed between the affected employee and the First Lien Credit Agreement Lenders and that such employment agreements will be assumed by Reorganized Premier, as modified.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving both (i) the assumption of the Assumed Contracts by Reorganized Premier, and (ii) the rejection of the Rejected Contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date.  Any provision of an Assumed Contract that allows a counterparty thereto to terminate, recapture, impose any penalty, condition any renewal extension or modify any term or condition upon a "change of control" provision constitutes an unenforceable provision that is void and of no force and effect.

### B.    Objections to Assumption of Executory Contracts and Unexpired Leases

#### 1.    Objection Procedure Generally.

Any party objecting to Premier's proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth on the Cure Payment Schedule shall file and serve a written objection to the assumption of such contract or lease on or before the deadline to object to Confirmation.  Failure to timely file an objection shall constitute consent to the assumption of the applicable Assumed Contract, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth on the Cure Payment Schedule is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

#### 2.    Objection Based on Grounds Other Than "Cure" Amount.

If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth on the Cure Payment Schedule and the Bankruptcy Court ultimately determines that Premier cannot assume the executory contract or lease or that Reorganized Premier cannot provide adequate assurance of future performance as proposed, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from the Cure Payment Schedule and shall be rejected.

31

3.    **Objection Based on "Cure" Amount.**

If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth the Cure Payment Schedule and such objection is not resolved between Premier and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount Reorganized Premier, must pay in order to assume such contract or lease. Notwithstanding the immediately preceding sentence, if Premier, in its discretion, determines that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption of the executory contract or lease imprudent, then Premier may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

C.    **Payment Related to Assumption of Executory Contracts and Unexpired Leases**

If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied by Reorganized Premier pursuant to section 365(b) of the Bankruptcy Code: (i) by payment in Cash within thirty (30) days following the Effective Date, of (1) the applicable "cure" amount set forth in the schedule of Assumed Contracts, (2) such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by Reorganized Premier; or (ii) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable under the Plan shall be made following entry of a Final Order or agreement.

D.    **Rejection Damage Claims for Rejected Contracts**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be treated as a Class 5(A-B) General Unsecured Claim, subject to the provisions of the Plan, and any Holders thereof, shall not receive on distributions on account of such claim.

## ARTICLE IX.

## EFFECTS OF CONFIRMATION AND RELATED PROVISIONS

A.    **Effect of Confirmation**

The provisions of the confirmed Plan shall bind the Debtors, any entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has Filed a proof of Claim or Interest in the Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is Impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and debts shall be as fixed and adjusted pursuant to the Plan. With respect to any taxes of the kind specified in

32

Bankruptcy Code section 1146(c), the Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded.

**B.    Injunction**

**1.    Generally.**

UNLESS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL INJUNCTIONS AND STAYS PROVIDED FOR IN THE CASES PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE OR OTHERWISE IN EFFECT ON THE CONFIRMATION DATE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.  FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM, AND RESTRAINED AGAINST, COMMENCING OR CONTINUING IN ANY COURT ANY SUIT, ACTION, OR OTHER PROCEEDING, OR OTHERWISE ASSERTING ANY CLAIM OR INTEREST, (A) SEEKING TO HOLD (I) THE DEBTORS, REORGANIZED PREMIER OR THE HOLDERS OF THE NEW EQUITY INTERESTS, OR (II) THE PROPERTY OF THE DEBTORS, REORGANIZED PREMIER OR THE HOLDERS OF THE NEW EQUITY INTERESTS, LIABLE FOR ANY CLAIM, OBLIGATION, RIGHT, INTEREST, DEBT, OR LIABILITY OF THE DEBTORS.

**2.    Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests.**

EXCEPT AS PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, AS OF THE CONFIRMATION DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM, ADMINISTRATIVE EXPENSE, INTEREST, OR OTHER DEBT OR LIABILITY THAT IS STAYED, IMPAIRED, OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS EITHER (X) AGAINST THE DEBTORS, REORGANIZED PREMIER, THE HOLDERS OF THE NEW EQUITY INTERESTS, OR THEIR PROPERTY ON ACCOUNT OF ALL OR SUCH PORTION OF ANY SUCH CLAIMS, ADMINISTRATIVE EXPENSES, INTERESTS, DEBTS, OR LIABILITIES THAT ARE STAYED, IMPAIRED, OR TERMINATED OR (Y) AGAINST ANY PERSON WITH RESPECT TO ANY RIGHT OF ACTION OR ANY OBJECTION TO A CLAIM, ADMINISTRATIVE EXPENSE, OR INTEREST, WHICH RIGHT OF ACTION OR OBJECTION, UNDER THE PLAN, IS WAIVED, RELEASED, ASSIGNED OR EXCLUSIVELY RETAINED BY ANY OF THE DEBTORS:  (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER, (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.  TO AVOID ANY DOUBT, EXCEPT AS OTHERWISE EXPRESSLY NOTED IN THE PLAN, NOTHING IN

THE PLAN OR HEREIN SHALL BE CONSTRUED OR IS INTENDED TO AFFECT, ENJOIN, MODIFY, RELEASE, OR WAIVE ANY CLAIMS, RIGHTS, AND ACTIONS THAT A THIRD PARTY MAY HAVE AGAINST A PERSON OTHER THAN THE DEBTORS, OR REORGANIZED PREMIER PROVIDED THAT SUCH CLAIMS, RIGHTS, AND ACTIONS ARE WHOLLY SEPARATE AND EXIST INDEPENDENTLY FROM ANY CLAIMS, RIGHTS, AND ACTIONS OF THE ESTATES.

**C.**     **Exculpation**

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH OF THE DEBTORS, THE PREPETITION AGENT, HOLDERS OF FIRST LIEN CREDIT AGREEMENT CLAIMS, CODA CAPITAL PARTNERS L.L.C. AND ITS AFFILIATES, ANGELO, GORDON & CO. LP AND ITS AFFILIATES, AND EACH OF THEIR RESPECTIVE AGENTS, SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY PERSON OR ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH, OR RELATED TO, THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THE PLAN OR ANY CONTRACT, INSTRUMENT, WAIVER, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, IN CONNECTION WITH THE PLAN, OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE CASES; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SUBSECTION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY PERSON OR ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**D.**     **Debtor Release**

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH DEBTOR, FOR ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AND TRANSFEREES SHALL BE DEEMED TO HAVE RELEASED ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST THE PREPETITION AGENT, AND HOLDERS OF FIRST LIEN CREDIT AGREEMENT CLAIMS, CODA CAPITAL PARTNERS L.L.C. AND ITS AFFILIATES, ANGELO, GORDON & CO. LP AND ITS AFFILIATES, AND EACH OF THEIR AND THE DEBTORS' RESPECTIVE AGENTS, ARISING PRIOR TO THE EFFECTIVE DATE, PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT OPERATE AS A WAIVER OF OR RELEASE FROM ANY CLAIMS OR CAUSES OF ACTION ARISING OUT OF (I) ANY EXPRESS CONTRACTUAL OBLIGATION OWING BY ANY SUCH PARTIES, OR (II) THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY SUCH PARTIES IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN.

**E.**     **Third Party Release**

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH CREDITOR THAT AFFIRMATIVELY ELECTS TO GRANT THIS RELEASE BY

CHECKING THE APPROPRIATE BOX ON THE BALLOT PROVIDED TO SUCH
CREDITOR IN CONNECTION WITH SOLICITATION OF SUCH CREDITORS' VOTE TO
ACCEPT OR TO REJECT THE PLAN, FOR ITSELF AND ITS RESPECTIVE
SUCCESSORS, ASSIGNS, TRANSFEREES, SUCH CREDITORS' OFFICERS AND
DIRECTORS, ACTING IN SUCH CAPACITIES AS OF THE PETITION DATE, SUCH
CREDITORS' AGENTS, MEMBERS, FINANCIAL ADVISORS, ATTORNEYS,
EMPLOYEES, PARTNERS, AFFILIATES, REPRESENTATIVES, IN EACH CASE IN
THEIR CAPACITY AS SUCH, SHALL, BY VIRTUE OF ITS VOTE, BE DEEMED TO
HAVE RELEASED THE PREPETITION AGENT, HOLDERS OF FIRST LIEN CREDIT
AGREEMENT CLAIMS, CODA CAPITAL PARTNERS L.L.C. AND ITS AFFILIATES,
ANGELO, GORDON & CO. LP AND ITS AFFILIATES, AND EACH OF THEIR AND THE
DEBTORS' RESPECTIVE AGENTS FROM ANY AND ALL DIRECT CLAIMS AND
CAUSES OF ACTION HELD BY SUCH CREDITOR WHATSOEVER, OR IN ANY
MANNER ARISING FROM OR RELATED TO, IN WHOLE OR IN PART, (I) THE
DEBTORS, (II) THE DEBTORS' RESTRUCTURING, (III) THE CONDUCT OF THE
DEBTORS' BUSINESSES, (IV) THE CHAPTER 11 CASES, (V) THE SUBJECT MATTER
OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR
INTEREST THAT IS TREATED IN THE PLAN, (VI) THE BUSINESS OR CONTRACTUAL
ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY AGENT THEREOF, AND/OR
(VII) THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE
CHAPTER 11 CASES, WHICH CLAIMS ARE BASED IN WHOLE OR IN PART ON ANY
ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE
BEFORE THE EFFECTIVE DATE, (THE MATTERS SET FORTH IN SECTIONS (I)
THROUGH (VII) OF THIS SECTION BEING REFERRED TO AS THE "RELEASED
CLAIMS") *PROVIDED, HOWEVER*, THAT, WITH RESPECT TO EACH PERSON OR
ENTITY RECEIVING THE BENEFIT OF SUCH RELEASE, THE RELEASES PROVIDED
TO SUCH PERSON OR ENTITY SHALL ONLY BE EFFECTIVE SO LONG AS SUCH
PERSON OR ENTITY DOES NOT ASSERT ANY CLAIMS ARISING FROM ANY OF THE
TRANSACTIONS THAT ARE THE SUBJECT OF ANY RELEASED CLAIMS AGAINST
THE CREDITOR GRANTING THE RELEASES SET FORTH HEREIN.

**F.    Subsequent Discovery of Facts Does Not Affect Enforceability of Releases**

Each releasing party under the Plan shall be deemed to have granted the releases set forth
herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those
which it now knows or believes to be true, and without regard to the subsequent discovery or
existence of such different or additional facts, and such party expressly waives any and all rights
that it may have under any statute or common law principle, including section 1542 of the
California Civil Code, which would limit the effect of such releases to those Claims or causes of
action actually known or suspected to exist at the time of Confirmation.  Section 1542 of the
California Civil Code generally provides as follows:  "A general release does not extend to
claims which the creditor does not know or suspect to exist in his or her favor at the time of
executing the release, which if known by him or her must have materially affected his or her
settlement with the debtor."

# ARTICLE X.

## RETIREE BENEFITS

The Debtors do not have any retiree benefit plans pursuant to Section 1129(a)(13) of the Bankruptcy Code.

# ARTICLE XI.

## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable nonbankruptcy law.

# ARTICLE XII.

## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

A.    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings related to the Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

      i.      to establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expense or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

      ii.      to grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

      iii.      to resolve any matters related to the rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

      iv.      to ensure that distributions to Holders of Allowed Claims, are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

      v.      to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the

Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

vi.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

vii.    to resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or the Confirmation Order;

viii.    subject to the restrictions on modifications provided in any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

ix.    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

x.    to consider and act on any dispute regarding and the compromise and settlement of any Claim against the Debtors;

xi.    to enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors wherever located;

xii.    to hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

xiii.    to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

xiv.    to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Cases or the Plan;

xv.   to remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

xvi.   to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

xvii.   to determine any other matter not inconsistent with the Bankruptcy Code; and

xviii.   to enter an order or final decree concluding the Cases.

B.   **Miscellaneous Matters**

1.   **Headings.**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

2.   **Notices.**

All notices and requests in connection with the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

Counsel for Debtors:                              and

Pachulski Stang Ziehl & Jones LLP            Scott Nelson
Laura Davis Jones, Esq.                       President and Chief Executive Officer,
David M. Bertenthal, Esq.                     Premier Trailer Leasing
Joshua M. Fried, Esq.                         681 Moore Road, Ste. 320
919 North Market Street, 17th Floor           King of Prussia, PA 19406
Wilmington, DE 19801


Counsel for the Agent                          and

Proskauer Rose LLP                            Proskauer Rose LLP
Peter J. Antoszyk, Esq.                       Jeffrey W. Levitan, Esq.
One International Place                        Eleven Times Square
Boston, MA 02110-2600                         New York, NY 10036-8299


All notices and requests to any Person of record holding any Claim, Administrative Expense, or Interest shall be sent to such Person at the Person's last known address or to the last known address of the Person's attorney of record. Any such Person may designate in writing any other address for purposes of the Plan, which designation will be effective on receipt.

3.   **Successors and Assigns.**

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

DOCS_SF:77216.21 70938-001

4.      **Severability of Plan Provisions.**

If, prior to Confirmation, any nonmaterial term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

5.      **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order the Bankruptcy Court, and extent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

6.      **Entire Agreement.**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

7.      **Additional Documents.**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, Reorganized Premier, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

8.      **Inconsistencies.**

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

# ARTICLE XIII.

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**A.**    **Conditions Precedent to Plan Confirmation**

It shall be a condition to Confirmation hereof that all of the material terms and conditions hereof are approved or jointly waived by the Debtors and the Agent.

**B.**    **Conditions Precedent to Plan Effectiveness**

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to both the Debtors and to the Agent and is entered by the Bankruptcy Court; (B) the Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be acceptable to the Debtors and the Agent; (C) the ABL Facility and such other corporate documents required to implement the Plan, as determined by the Debtors and the Agent, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; (D) all actions, documents, certificates, and agreements necessary to implement the Plan, as determined by the Debtors and the Agent, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws have been fully executed and delivered; and (E) the Confirmation Order shall either be a Final Order or, if an appeal has been Filed, no stay has been obtained.  The foregoing conditions may be jointly waived by the Debtors and the Agent (such waiver shall not require any notice, Bankruptcy Court order, or any further action).

**C.**    **Effect of Non-Occurrence of Conditions to Effective Date**

Each of the conditions to the Effective Date must be satisfied or duly waived, as provided above, within thirty days after the Confirmation Date.  If the Confirmation Order is vacated for failure to satisfy a condition to the Effective Date, the Plan shall be deemed null and void in all respects.

# ARTICLE XIV.

## EFFECT OF CONFIRMATION

**A.**    **Binding Effect of Confirmation**

Confirmation will bind the Debtors; all Holders of Claims and Existing Equity Interests and other parties in interest to the provisions of the Plan whether or not the claim or interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim or Interest has accepted the Plan.

**B.**    **Good Faith**

Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) all

40

Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.      No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## ARTICLE XV.

## MODIFICATION OR WITHDRAWAL OF PLAN

**A.      Modification of Plan**

The Debtors may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Debtors and the Agent reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Debtors and the Agent determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, Premier or Holdings may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Plan. After the Effective Date, Reorganized Premier may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**B.      Withdrawal of Plan**

The Debtors reserve the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.

## ARTICLE XVI.

## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan. Holders of Claims entitled vote on the Plan are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**A.      The Solicitation Package**

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate Ballot and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

41

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

Holders of Class 3(B) First Lien Credit Agreement Claims, entitled to vote to accept or reject the Plan, shall be served paper copies of the Disclosure Statement with all exhibits, including the Plan. Any party who desires additional paper copies of these documents may request copies from the Voting Agent by contracting Kurtzman Carson Consultants, 2335 Alaska Avenue, El Segundo, CA 90245.

**B.    Voting Deadline**

The period during which Ballots with respect to the Plan will be accepted by the Company will terminate at 4:00 p.m. (Eastern time) on August 23, 2011 (the "Voting Deadline"), unless the Company, in its sole discretion, extends the date until which the Ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily or hourly basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

**C.    Voting Instructions**

Only the Holders of Allowed Class 3(B) Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstention will not be counted as a vote for or against the Plan. Voting instructions are attached to each Ballot.

The deadline by which The Voting Agent must receive your Ballot is 4:00 p.m. (Eastern time), on August 23, 2011.

Any Ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot.

By signing and returning a Ballot, a Holder will be certifying to the Bankruptcy Court and the Company that, among other things:

42

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has voted all of its Claims within Class 3(B) either to accept or reject the Plan and cast the same vote with respect to all Claims in Class 3(B);

- no other Ballot with respect to the same Claim has been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked.

## D.    Voting Tabulation

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (1) any Ballot that is illegible, contains insufficient information to permit identification of the Holder, or is not on the form provided; (2) any Ballot cast by a party that does not hold a Claim in the Class that is entitled to vote on the Plan; (3) any Ballot received after the Voting Deadline, except as described below; (4) any unsigned Ballot; (5) any Ballot that is not marked to accept or reject the Plan, or is marked both to accept and reject the Plan; (6) any Ballot cast by a party that holds a Claim in a Class that is entitled to vote, but did not hold the Claim on August 22, 2011 (the "Voting Record Date"); and/or (7) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan for any reason.

Unless the Company elects otherwise, Ballots received after the Voting Deadline may not be counted.  The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each Holder of a Class 3(B) Claim.  Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered when the Voting Agent actually receives the executed Ballot, including delivery by facsimile and email.  No Ballot should be sent to the Company, or the Company's financial or legal advisors.  The Company expressly reserves the right to amend, from time to time, the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Confirmation.  In that event, solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Holders must vote all of their Claims either to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the Voting Class, the Company may, in its discretion, and to the extent possible, aggregate the Class 3(B) Claims of any particular Holder within the Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

43

The Company will file with the Bankruptcy Court, prior to the commencement of the Confirmation Hearing, a report prepared by The Voting Agent reflecting the tabulation of Ballots for the Class entitled to vote on the Plan (the "Voting Report"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the applicable voting instructions or that contains any form of irregularity (each, an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Company's intentions with regard to such Ballots that do not conform to the applicable voting instructions or that contains any form of irregularity. Neither the Company nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur an liability for failure to provide such notification.

## ARTICLE XVII.

## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    Valuation of the Company

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, it is necessary to ascribe an estimated value, or range of values, to the Company. The Debtors have been advised by Lazard, their financial advisor, with respect to the estimated value of the Company, including the Reorganized Debtors, on a going-concern basis.

**THE ESTIMATES OF THE ENTERPRISE VALUE CONTAINED IN THIS SECTION DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE VALUATION INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

### 1.    Overview.

Lazard has estimated the value of the Company, including the Reorganized Debtors, as of the date of this Disclosure Statement. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Company's operations on a going concern basis. The valuation analysis assumes that the Plan becomes effective on September 1, 2011 (the "Assumed Effective Date") and is based on projections provided by the Debtors' management ("Projections") for September 1, 2011 – December 31, 2015 (the "Projection Period"), which are attached to the Disclosure Statement as **Exhibit B**.

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Company falls within a range from approximately $74 to $99 million, with a mid-point estimate of $86.5 million as of the Assumed Effective Date. For purposes of

this valuation, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 1, 2011, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENTLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

The foregoing estimate of the Enterprise Value of the Company is based on a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the continued implementation of the Company's business plan, the achievement of the forecasts reflected in the Projections, access to adequate exit financing, the continuing leadership of the existing management team, market conditions as of the date of the Disclosure Statement continuing through the Assumed Effective Date, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Company, including the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Company will achieve its Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. Certain of the results forecast by the management of the Company are materially better than the recent historical results of operations of the Company. As a result, to the extent that the estimate of the Enterprise Value is dependent upon the Company performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on Enterprise Value.

In estimating the Enterprise Value, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Company's business and its prospects; (c) met with and discussed the Company's operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Company; (e) reviewed certain publicly available information concerning public and private M&A transactions for companies Lazard deemed generally comparable to the operating business of the Company; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the

45

Company's business, operating assets and liabilities and the Company's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Company as well as publicly available information. Additionally, in 2010, Lazard conducted a marketing process to provide an indication of what prospective buyers were willing to pay for the Company. While Lazard did not rely on this information in determining its valuation, Lazard did assess the results of the process in validating the reasonableness of the various valuation methodologies. Further detail on the 2010 marketing process is provided herein.

Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Company were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

Lazard's estimates of the Enterprise Value of the Company do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Company's securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Company set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies, which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Company set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Company, Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Company, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Company's industry and economic conditions generally, and other factors which generally influence the prices of securities.

## 2.    Valuation Methodology.

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Company. In performing the financial

analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the management of the Debtors. Lazard's valuation analysis must be considered as a whole. Lazard relied upon the results of three valuation methodologies - comparable company analysis, discounted cash flow analysis, and precedent transaction analysis. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

**a.**    Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly sales, earnings before interest and taxes ("EBIT") and earnings before interest, taxes, depreciation and amortization ("EBITDA"). In addition, each of the selected public company's operational performance, operating margins, profitability, leverage, capital expenditures and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Company's actual and projected operational performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Company. EBITDA is generally considered a strong proxy for the cash flow provided from the operations of a company and as such, it is a good determinant of the ability of a company to service claims against the Company. Additionally, EBITDA does not reflect the effects of capital structure and other non-operating items.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Company. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, capital expenditure requirements, maturity of businesses, location, profitability, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information. Many of the Peer Group companies are much larger in size than the Company and possess other characteristics that differ from the Debtors. These considerations may reduce the relevance of the comparable company analysis.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Company in one or more of the factors described above: CAI International, H&E Equipment Services, RSC Holdings, Ryder System, TAL International Group and United Rentals.

Lazard calculated market multiples for the Peer Group based on 2011 estimated EBITDA by dividing the enterprise value of each comparable company as of August 4, 2011, by the projected 2011 EBITDA and 2012 EBITDA as estimated by equity research analysts. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected

47

revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines.

Lazard then applied the range of multiples described above to the Company's 2011P EBITDA and 2012P EBITDA, as adjusted for restructuring fees EBITDA ("Adjusted EBITDA") to determine a range of Enterprise Values.

**b.**    Precedent Transactions Analysis

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Company. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as sales, EBITDA and EBIT. Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of sales and EBITDA for companies in similar lines of business to the Company. The derived multiples are then applied to the Company's operating statistics to determine the Enterprise Value or value to a potential strategic buyer. Similar to the comparable company analysis, Lazard focused mainly on EBITDA multiples in comparing the valuations of the Company and the selected companies involved in relevant precedent transactions.

Other factors not directly related to a company's business operations can affect a valuation based on  precedent transactions, including:  (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage). Lazard evaluated various merger and acquisition transactions that have occurred in the equipment leasing industry over the last five years.

In addition, some of the transactions that have occurred over the past five years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace. As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the precedent transactions analysis explains other aspects of value besides the inherent value of a company.

48

In deriving a range of Enterprise Values for the Company under this methodology, Lazard calculated multiples of total enterprise value to the last twelve months ("LTM") EBITDA of the acquired companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction less any cash on the target's balance sheet, by estimated LTM EBITDA. Lazard then applied these multiples to the 2011P Adjusted EBITDA for the Company.

        c.        Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Company's unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by evaluating two (2) approaches: 1) applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate; and 2) dividing the projected unlevered free cash flow in the year following the final projected year by the Discount Rate minus a range of perpetual growth rates, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Company, assuming a targeted long-term debt-to-total capitalization ratio based on an assumed range of the Company's pro forma capitalization and the average leverage ratio of the Peer Group. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. In calculating the cost of equity, Lazard also considered the impact of unsystematic risks specific to the Company, including risks related to operational restructuring activities, business turnaround, margin improvement and residual bankruptcy effects, among others. To estimate the cost of debt, Lazard estimated what would be the Company's blended cost of debt based on current capital markets conditions and the financing costs for comparable companies with leverage similar to the Company's target capital structure. The actual cost of debt for the Company will be determined by available exit financing and may differ from this estimate. In determining the terminal multiple, Lazard used the EBITDA multiple range derived for the Peer Group.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Company, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning on the Assumed Effective Date of September 1, 2011 and ending

December 31, 2015, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital, capital expenditures, proceeds from asset sales and cash taxes. For purposes of the DCF, Lazard utilized an assumed 35% income tax rate. These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using a range of Discount Rates calculated in the manner described above to arrive at a range of Enterprise Values.

The DCF approach relies on the Company's ability to project future cash flows with some degree of accuracy. Because the Company's projections reflect significant assumptions made by the Company's management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurances can be provided that projected results are attainable or will be realized. Lazard cannot and does not make any representations or warranties as to the accuracy or completeness of the Company's projections.

### d.    Marketing Process

In 2010, Lazard conducted a marketing process to raise financing for use in a recapitalization of the Company. While Lazard did not rely on this information in determining its valuation, Lazard did assess the results of the process in validating the reasonableness of the various valuation methodologies. The marketing process provides an indication of what prospective buyers were willing to pay for the Company based on the Company's track record, financial projections of the Company and the current industry and capital markets environment.

Lazard, with the Company's assistance, identified and contacted 69 potential investors it believed might be interested in acquiring the Company, based on a number of factors, including their interest in the transportation industry, their desire to acquire financially distressed companies and their ability to quickly complete diligence and fund a transaction.

An initial diligence package containing a Confidential Information Memorandum detailing information on the Company's operations, industry, and historical and projected financial information was distributed to 38 interested parties who executed non-disclosure agreements. Additionally, parties were granted access to an electronic data room. Interested parties were invited to attend management presentations during March and April 2010 and management held multiple meetings with 12 interested parties.

Following discussions with senior management and the initial diligence package, investors were invited to submit non-binding indications of interest. The Company received non-binding term sheets from 10 interest parties, including one strategic bidder.

After subsequent diligence and discussions with Lazard, interested parties were invited to submit revised bids. At that time, the Company received non-binding term sheets (or affirmation of previous bid) from 7 interested parties. Each of these bids was subject to legal, business and financial due diligence as well as other conditions precedent. The implied Enterprise Value of these bids ranged from approximately $68 million to $87 million with a mid-point average of approximately $74 million, implying an enterprise value multiple significantly below the median enterprise value/EBITDA multiple of the Peer Group.

Since the end of the marketing process, the market for transportation leasing and underlying macroeconomic factors have improved slightly and the Company's financial performance has stabilized. However, in the intervening time, the Company had no access to capital and invested minimal capital expenditures into new trailers and therefore the Company's fleet has aged.

Notwithstanding the detrimental effects of capital expenditure limitations, Lazard's mid-point estimate of Enterprise Value exceeds the range of bids received in 2010, reflecting the improved economic and business conditions. It is also important to note that while our value estimate has increased, the median of the Peer Group EBITDA multiple has declined since the time of the bids.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE COMPANY MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## ARTICLE XVIII.

## CONFIRMATION PROCEDURES

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. On or about the Petition Date, the Company will promptly seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement and confirmation of the Plan. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy

Court shall enter the Confirmation Order.  The Company believes that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims will be paid in full in cash on the Effective Date.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date

The Company believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11; and (3) the Plan has been proposed in good faith.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors.  Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan,

or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Chapter 11 Cases were converted to liquidation cases under Chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a Chapter 7 trustee to liquidate all of the assets into Cash. The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical Chapter 7 liquidation of the Company (after subtracting the Chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a Chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical Chapter 7 liquidation of the Company's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Further, in Chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of claims expressly subordinated by their terms or bankruptcy court order; and (e) holders of equity interests.

Of the foregoing groups of Claims, Priority Non-Tax Claims, Priority Tax Claims, and Administrative Claims, are either unclassified or "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims and Interests are deemed to accept the Plan. First Lien Credit Agreement Claims are "Impaired" under the Plan and are entitled to vote on the Plan. Second Lien Credit Agreement Claims and General Unsecured Claims will not receive any distributions under the Plan and, therefore, are deemed to reject the Plan. Because the Bankruptcy Code requires that impaired creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical Chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a Chapter 7 liquidation, after accounting for recoveries by Secured, Administrative, and Priority creditors, the impaired creditors and interest holders will receive more or less than under the Plan. If the probable distribution to impaired creditors and interest holders under a hypothetical Chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of impaired creditors and interest holders.

As described in more detail in the liquidation analysis set forth in **Exhibit C** hereto (the "Liquidation Analysis"), the Company believes that the value of any distributions in a Chapter 7 case would be less than the value of distributions under the Plan. In particular, proceeds received in a Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a Chapter 7 trustee would likely further reduce Cash available for distribution. Holders of First Lien Credit Agreement Claims would receive substantially less in a hypothetical liquidation of the Debtors than under the Plan. Holders of Second Lien Lender Claims, General Unsecured Claims and Existing Equity and Membership Interests would not receive any distributions either under the Plan or under a hypothetical

53

liquidation of the Debtors, so the "best interests" test is satisfied as to such creditors and Interest holders.

2.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates that the Company's balance sheet will become materially deleveraged by the elimination of the First Lien Credit Agreement Claims, Second Lien Credit Agreement Claims, and General Unsecured Claims. In addition, the Plan also contemplates an ABL Facility sufficient to fund the Company's operations and fund payments to be made under the Plan, and, therefore, sufficient funds will exist to make all payments required by the Plan. The Company's overall enterprise value will accrue directly to the Holders of the First Lien Credit Agreement Claims, who will receive the New Equity Interests in Reorganized Premier, pro rata, in exchange for their First Lien Credit Agreement Claims. The Company believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11). The financial projections contained in **Exhibit B** hereto shows the financial projections of Reorganized Premier projected through December 31, 2015. As set forth on **Exhibit B**, the projections demonstrate that the Debtors will be able to fund operations and that confirmation of the Plan is not likely to be followed by Reorganized Premier's liquidation or the need for further financial reorganization.

3.      **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims and Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of that claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the equity interest holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims in Class 1(A-B) are not Impaired under the Plan, and as a result the Holders of such Claims are deemed to have accepted the Plan.

54

First Lien Credit Agreement Claims in Class 3(B) are Impaired under the Plan. The voting class will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Class 3(A) and Classes 4(A-B), 5(A-B), 6(A-B) and 7(A-B) will not receive a distribution under the Plan and are deemed to reject the Plan and are not entitled to vote on the Plan.

4.        **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Interest any property.

55

The condition that a plan be "fair and equitable" to a non accepting Class of Interests includes the requirements that either: (a) the plan provides that each Holder of an Interest in that Class receives or retains under the plan, on account of that Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Interests junior to the non-accepting Class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary .

The Company submits that if the Company "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

Prior to deciding whether and how to vote on the Plan, Holders of Class 3(A-B) First Lien Credit Agreement Claims should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article XVII, entitled "Plan Related Risk Factors."

## C.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested part desiring further information about the Plan should contact: Counsel for the Debtors: Laura Davis Jones, Esq., Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, via e-mail at ljones@pszjlaw.com or by phone at (302) 652-4100.

## D.    DISCLAIMER

In formulating the Plan, the Company has relied on financial data derived from books and records. The Company, therefore, represents that everything stated in this Disclosure Statement is true to the best of their knowledge. The Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or

comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections mayor may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Company for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Company have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Company, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by the Company shall have no liability for the information in this Disclosure Statement.**

**Prior to voting to accept or reject the Plan, Holders of Claims in Class 3 should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

## ARTICLE XIX.

## PLAN RELATED RISK FACTORS

### A.    GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    Parties in Interest May Object to Company's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims and interests in such class. The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created seven Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such Class.

Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the one voting Class, the Company may elect not to File the Cases or to amend the Plan.

### 3.    The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan

The Company cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Company receives the requisite acceptances, the Company cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Interest Holder might challenge the adequacy of this Disclosure Statement or the Solicitation Procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail above in Article XVIII herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code. While the Company believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

The Confirmation of the Plan is also subject to certain conditions as described in Article XV of the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests.

The Company, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any nonaccepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    The Company May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan and any final order authorizing the use of cash collateral and approving any debtor in possession financing, the Company reserves the right to object to the amount or classification of some Claims or Interest deemed Allowed under the Plan.

The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection except to the extent provided in any Final Cash Collateral Order or other Order that may be entered by the Bankruptcy Court.

     **5.**     **Risk of Non-Occurrence of the Effective Date**

Although the Company believes that the Effective Date will occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

**C.**     **FINANCIAL INFORMATION; DISCLAIMER**

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

**D.**     **CERTAIN TAX MATTERS**

For a summary of certain federal income tax consequences of the Plan to certain Holders of Claims and to the Debtors, see Article XXI below, entitled "Certain U.S. Federal Income Tax Consequences."

**E.**     **RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE**

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

**F.**     **LIQUIDATION UNDER CHAPTER 7**

If no plan can be confirmed, the Company's Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' liquidation analysis is set in **Exhibit C** hereto.

G.      **SECURITIES RISK**

As discussed in Article XVIII of this Disclosure Statement, the Plan provides for the Company to issue Plan Securities (as defined in Article XX herein) to Holders of First Lien Credit Agreement Claims.  The Company believes that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  The Company further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.  However, there is no guaranty that the Plan Securities will be recognized as exempt from federal and state securities registration requirements as discussed in Article XX of this Disclosure Statement.

**These risk factors contain certain statements that are "forward looking statements" within the meaning of Section 21E of the Securities Exchange Act and are made pursuant the safe harbor provisions thereof.  These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity, or other financing to fund operations, currency exchange rate fluctuations, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies, and other market and competitive conditions.  Holders of Claims and Interests are cautioned that the forward looking statements speak as of the date made and are not guarantees of future performance.  Actual results or developments may differ materially from the expectations expressed or implied in the forward looking statements and the Debtors undertake no obligation to update any such statements.**

**ARTICLE XX.**

**SECURITIES LAW MATTERS**

A.      **PLAN SECURITIES**

The Plan provides for the Company to issue to Holders of First Lien Credit Agreement Claims in Class 3(B) 100% of the New Equity Interests to the First Lien Credit Agreement Holders in Reorganized Premier (the "Plan Securities").  The Company believes that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  The Company further believes that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

60

B.    **ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN**

    1.        **Exemption from Registration**

        Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

        Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

        In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

        To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

        If the Plan Securities are not covered by section 1145 of the Bankruptcy Code, the Plan Securities will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law in the event that section 1145 is not applicable to the Plan Securities.

    2.        **Resales of Plan Securities; Definition of Underwriter**

        Section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the

61

debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular person may be an "underwriter," the Debtors make no representations concerning the right of any person to freely resell Plan Securities. Accordingly, the Company recommends that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## ARTICLE XXI.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan.

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

1.      **U.S. Federal Income Tax Consequences to the Debtors**

For U.S. federal income tax purposes, Premier has net operating losses and net operating loss carryovers (collectively, "NOLs") of approximately $110 million as of December 31, 2010. In connection with the Plan, the amount of Premier's NOLs may be significantly reduced.

(a)    Cancellation of Indebtedness Income

Under the IRC, a taxpayer generally recognizes cancellation of indebtedness ("COD") income in an amount equal to the difference between the "adjusted issue price" of the indebtedness discharged and the sum of (i) the amount of any cash, (ii) the "issue price" of any new debt instruments, and (iii) the fair market value of any stock or other property transferred in satisfaction of the discharged indebtedness. The adjusted issue price of a debt instrument at the beginning of the first accrual period is its issue price, here the amount borrowed, and, on any day thereafter, it is the sum of the issue price and the amount of interest and original issue discount accruing on the debt instrument, reduced by the amount of any payment previously made on the debt instrument. COD income also includes any interest that the taxpayer deducted on the accrual method of accounting but remains unpaid at the time the indebtedness is discharged. COD income generally does not include the discharge of indebtedness to the extent payment of the liability would have given rise to a deduction.

Premier will realize substantial COD income upon the issuance of the New Equity Interests and the First Lien Credit Agreement Lenders' Payment in satisfaction of the First Lien Credit Agreement Allowed Claims in an amount equal to the excess of (i) the adjusted issue price of the First Lien Credit Agreement Allowed Claims over (ii) the sum of the fair market value of the New Equity Interests, the cash component of the First Lien Credit Agreement Lenders' Payment and the issue price of any note component of the First Lien Credit Agreement Lenders' Payment issued in exchange for the First Lien Credit Agreement Allowed Claims. Premier will also realize COD income upon the cancellation of the Second Lien Credit Agreement Claim equal to the adjusted issue price of that debt plus any unpaid interest it deducted with respect to it.

Taxpayers that realize COD income generally are required to include such amounts in gross income for purposes of determining their U.S. federal income tax for the year. However, because Premier is under the jurisdiction of the bankruptcy court in a Title 11 case, Premier will not be required to include the COD income in its gross income. Instead, Premier will be required to reduce certain tax attributes (e.g., NOLs, general business credit carryovers and tax basis in property (collectively, "Tax Attributes")) by the amount of the COD income excluded from gross income. If the amount of COD income exceeds the available Tax Attributes, such excess is permanently excluded from income. The reduction in Tax Attributes occurs on the first day of the taxable year following the taxable year in which such COD income is realized.

(b)    Utilization of NOLs and Net Unrealized Built-in Gains

In general, when a corporation undergoes an "ownership change," generally a more than 50 percent increase in the ownership of stock of the common parent by five-percent shareholders at any time during a rolling three year testing period, Section 382 limits the corporation's ability to utilize its NOLs and, if, at the time of the ownership change, the corporation has a net unrealized built-in gain in its assets (i.e., where the fair market value of its assets exceeds the tax basis in its assets by more than the lesser of $10 million or 15 percent of the fair market value of its assets), increases the utilization of its NOLs by the amount of certain "recognized built in gains" realized during the five-year period beginning on the ownership change date. Premier will undergo an ownership change as a result of the consummation of the Plan. The annual limitation on a corporation's use of NOLs, excluding any increase to the limitation as a result of

64

the net unrealized built in gain/recognized built in gain rule discussed above, following an ownership change ("annual Section 382 limitation") is generally equal to the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" (currently 4.3 percent for ownership changes occurring in July of 2011). Premier anticipates that it will have a net unrealized built-in gain in its assets under Section 382 on the Effective Date.

A special rule under Section 382, applicable to corporations under the jurisdiction of a court in a Title 11 case, will apply in calculating the appropriate annual Section 382 limitation. Under this special rule, the annual Section 382 limitation will be calculated by reference to the value of New Equity Interests stock (with certain adjustments) immediately after the Effective Date (as opposed to immediately before the Effective Date).

(c)    U.S. Federal Alternative Minimum Tax

Premier may be subject to the alternative minimum tax (the "AMT") which imposes a tax equal to the amount by which 20% of a corporation's alternative minimum taxable income ("AMTI") exceeds the corporation's regular tax liability. AMTI is calculated pursuant to specific rules in the IRC which eliminate or limit the availability of certain tax deductions and which include as income certain amounts not generally included in computing a corporation's regular tax liability (however, any COD income excluded from Premier's' regular taxable income, as described above, would also be excluded from its AMTI). In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryovers, only 90 percent of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

Any AMT a corporation pays will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is subject to regular federal income tax.

2.    **Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN. CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XXII.

## ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Cases or conversion to

65

Chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation of the Plan.

If the Cases were dismissed, Creditors would revert to a "race to the courthouse," the result being that Creditors would not receive a fair and equitable distribution of the Debtors' Assets. As set forth in the Debtors' liquidation analysis above, the Debtors believe that the Plan provides a greater recovery to Creditors than would be achieved under Chapter 7 since, at the very least, conversion to Chapter 7 necessarily imposes an additional layer of expenses on the Debtors' estates, reduces the funds available for unsecured Creditors and may result in a substantial delay in payment to Creditors. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan.

## ARTICLE XXIII.

## RECOMMENDATION

In the opinion of the Company, the Plan is preferable to the alternatives described above because it will provide the greatest aggregate recoveries to the Holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors recommend that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: August 22, 2011          PTL HOLDINGS LLC

By:      Scott Nelson
Its:     Authorized Officer

Dated: August 22, 2011          PREMIER TRAILER LEASING, INC.

By:      Scott Nelson
Its:     Chief Executive Officer