# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>**PTL Holdings LLC,**<br>**Premier Trailer Leasing,**<br>**Inc.,**<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 11-12676 (BLS)<br><br>(Jointly Administered)<br><br>Related to Docket No. 13 |

Laura Davis Jones, Esquire
Pachulski Stang Ziehl & Jones,
LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899

- AND –

Alan J. Kornfeld, Esquire
Pachulski Stang Ziehl & Jones,
LLP
10100 Santa Monica Boulevard
11th Floor
Los Angeles, CA 90067

*Counsel for Debtors*

M. Blake Cleary, Esquire
Young Conaway Stargatt & Tay-
lor, LLP
The Brandywine Building
17th Floor
1000 West Street
Wilmington, DE 19899

- AND –

Robert Schmidt, Esquire
Gregory Horwitz, Esquire
Kramer Levin Naftalis & Frankel,
LLP
1177 Avenue of the Americas
New York, NY 10036

*Counsel for Fifth Street Finance*
*Corp.*

# OPINION[1]

The matter before the Court is the request of PTL Holdings, LLC and Premier Trailer Leasing, Inc. (collectively, the "Debtors") for confirmation of their prepackaged Joint Plan of Reorganization (the "Plan"). The primary issue here is the value of the Debtors' business.[2] The Debtors and their first lien secured creditor contend that the business is worth less than the amount of the first lien debt. The second lien secured creditor, whose claims will be wiped out under the Plan, contends that it is in the money, and that because the Plan proposes to permit the first lien creditor to recover more than its allowed claims, the Plan cannot be confirmed. For the reasons that follow, the Court concludes that the Debtors have carried their burden to demonstrate that the total enterprise value of the Debtors' business is insufficient to provide for a recovery to the second lien secured creditor. Accordingly, the Court will confirm the Plan.

## I. BACKGROUND

The Debtors commenced these prepackaged Chapter 11 cases on August 23, 2011. The Debtors remain debtors and debtors-in-possession, and no trustee or official committee has been appointed.

The Debtors operate a trailer leasing company. Their business principally consists of purchasing semi-trailers and then leasing them to customers for long-term, short-term, or storage use. Long-term leases typically run between one and five years; short-term rentals about thirty days. As trailers age, they become less usable and command a lower price. Newly purchased trailers therefore primarily go to long-term lease customers, and are the most lucrative. Older, less-lucrative trailers go to rental customers. When trailers are no longer suitable for over-the-road use, the Debtors lease them out as storage space. The Debtors

---

[1] This constitutes the Court's findings of fact and conclusions of law regarding confirmation of the pre-packaged Joint Plan of Reorganization. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] The office of the United States Trustee has also objected to the scope of certain exculpation provisions in the Plan. This objection is addressed *infra*.

currently have about 1,500 to 1,800 customers and just over 11,000 trailers in their inventory.

The Debtors had been considering various restructuring alternatives since 2009, two years before they filed bankruptcy. The Debtors had to do so because by July 2009 they had defaulted under their prepetition financing facilities, leading their lenders to deny them access to capital to purchase new trailers. Unable to meet customer demands for trailers, the Debtors' business—both in terms of revenue and EBITDA (earnings before interest, taxes depreciation and amortization)—shrank.

At first, the Debtors and their equity holders discussed the possibility that the equity holders would invest more capital in the business. But those discussions led to a dead-end because the existing holders of secured debt would not agree to be partially subordinated as part of the deal. The Debtors next worked with their financial advisor, Lazard Middle Market LLC ("LMM"), to began a broad-based capital raising effort,[3] marketing the company either for a sale or as an opportunity to invest equity capital. Although several bids were submitted, the lenders deemed them all inadequate. In late 2010 and early 2011, the Debtors explored a lender-supported restructuring in which the Debtors' existing lenders would supply new funding. But the lenders again balked. Finally, in response to increasing pressure from their secured lenders, the Debtors evaluated the prospects of an orderly liquidation of their assets. In the meantime, a new entity, Garrison Investment Group and its affiliates ("Garrison"), became the holder of all of the Debtors' first lien debt. That change ultimately allowed the Debtors to negotiate the terms of a comprehensive restructuring with Garrison that led to the filing of these cases and the proposed Plan.

When they filed for bankruptcy, the Debtors had approximately $110.5 million of secured debt outstanding. Of that, roughly $84 million is first lien debt held by Garrison. The remaining $27 million is second

---

[3] It was in the context of this capital raise effort that the Debtors and LMM prepared a Confidential Information Memorandum ("CIM"), upon which Fifth Street now bases several of its objections to the Debtors' valuation.

lien debt held by Fifth Street Finance Corp. ("Fifth Street"). The amount and priority of those claims is undisputed. The Debtors also owe roughly $26 million to Stoughton, a trailer manufacturing company, for capital leases on a number of trailers (the "Stoughton Leases").[4]

The Plan, which the Debtors filed along with their bankruptcy petitions, proposes to restructure and significantly deleverage the Debtors' capital structure. It would exchange Garrison's first lien debt for 100% of the equity in the reorganized business (subject to dilution from proposed equity and stock options to be provided to management).[5] It further provides that the Debtors will have access to at least $20 million of new financing for working capital purposes. This financing is the crux of the Debtors' reorganization strategy, which is predicated on the high per-unit lease rates for new trailers that the Debtors will use the new money to purchase. The Plan also contemplates that the Debtors will assume the Stoughton Leases. The Plan does not, however, provide Fifth Street with a recovery.

The Plan's treatment of Fifth Street's second lien debt is based on an estimate of the reorganized Debtors' total enterprise value ("TEV") prepared by Andrew Torgove ("Torgove"), a managing director at LMM. Torgove's first report, dated August 12, 2011, estimated a TEV range for the reorganized Debtors of between $74 million and $99 million, with a midpoint of $86.5 million. After errors were discovered in that report, Torgove issued a "Valuation Report Supplement," dated

---

[4] At trial, Fifth Street suggested that the fair market value of the trailers subject to the Stoughton Leases may actually be less than $26 million, meaning that Stoughton is an undersecured creditor who, by assumption of the leases, is nonetheless receiving full payment on it claims. Absent litigation on this issue or a consensual arrangement with Stoughton, however, the Court will not speculate as to the results of a hypothetical challenge to Stoughton's claims. For purposes of this analysis, therefore, the Court will assume the validity and value of the $26 million liability ascribed by the Debtors to the Stoughton Leases.

[5] Specifically, the Plan provides for a distribution to the Debtors' management of (i) direct equity equal to 7.5% of the common stock of the reorganized Debtors, and (ii) stock options that entitle management to acquire another 7.5% of the common stock of the reorganized Debtors.

September 27, 2011, and increased the TEV range to $76 million to $102 million, with a midpoint value of $89 million.

Fifth Street is entitled to a recovery only if the Court finds that the reorganized Debtors' TEV is greater than $110 million (the $26 million Stoughton Lease claim plus the $84 million Garrison first lien claim). If the Debtors' TEV surpasses that hurdle, then Fifth Street is in the money and the Plan is unconfirmable because it violates § 1129.

The Court conducted a three-day confirmation hearing on the Plan on October 3-5, 2011. The following witnesses appeared for the Debtors: Curtis Sawyer ("Sawyer"), the Debtors' chief financial officer; Scott Nelson ("Nelson"), the Debtors' chief executive officer; and Torgove. Seymour Preston Jr. ("Preston"), a managing director at Goldin Associates, Inc. ("Goldin"), testified for Fifth Street.[6] The parties also prepared and stipulated to the admission of nearly two hundred trial exhibits.[7]

## II. LEGAL ANALYSIS

As the plan proponent, the burden rests with the Debtors to demonstrate that the requirements of Bankruptcy Code § 1129 have been satisfied. *See Exide Tech.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003) ("The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a), while the objecting parties bear the burden of producing evidence to support their objections."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 592, 598-99 (Bankr. D. Del. 2001); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000). The objections raised by Fifth Street here go to both the good faith standard imposed by § 1129(a)(3) and the "fair and equitable" test under § 1129(b). The Debtors must prove by a prepon-

---

[6] Torgove and Preston each possess impressive academic and professional credentials and substantial experience. Both were qualified by the Court as experts in the field of valuation of companies in bankruptcy proceedings. (Tr. Trans. (10/4) at 115; (10/5) at 131-32.)

[7] The Court again expresses its compliments and thanks to counsel on both sides for their courteous, professional and efficient approach to preparing this complex matter for trial on an expedited basis.

derance of the evidence that the confirmation requirements have been met. *See In re DeLuca*, Case No. 95-11924, 1996 Bankr. LEXIS 1950, at *49-49 (Bankr. E.D. Va. April 15, 1996) (rejecting "clear and convincing" evidentiary standard in confirmation context).

## A. The Business Plan and Projections

The financial projections at the heart of this valuation exercise were prepared by the Debtors' management team. Fifth Street strongly criticizes those projections as being premised on unduly pessimistic and faulty assumptions, and contends that the projections were manu-factured to produce a valuation that places Fifth Street out of the mon-ey. The Court finds, however, that the record developed at trial does not support Fifth Street's criticism.

As set forth below, the Debtors' projections anticipate substantial increases in both revenue and EBITDA (20% and 25%, respectively) over the next four years. Moreover, while the quality and integrity of projections are necessarily at issue in every valuation dispute, *see In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 374-78 (Bankr. D. Del. 2006) (finding, after lengthy trial, that projections were unreliable and delibe-rately skewed to produce a predetermined valuation result), the parties have had a full and fair opportunity to test, in discovery and at trial, the assumptions and conclusions that underlie the projections. Following that exercise, and upon due consideration of the evidence and live tes-timony, the Court is satisfied that the projections were properly pre-pared and are sufficiently reliable to form the basis of the competing experts' analyses.

The credible evidence at trial established that the Debtors' busi-ness plan and projections were prepared primarily under the direction of the Debtors' experienced senior management, particularly Sawyer and Nelson. Both Sawyer and Nelson have been employed with the Debtors since 2009; both have also spent years in the transportation in-dustry. Sawyer has a bachelor's degree in economics from Stanford University and a master's degree in business administration from the University of California at Berkeley. He has extensive experience in the

6

leasing business generally and the trailer leasing business specifically. He also has a long professional history of developing business plans and projections for leasing companies, and has regularly done so for the Debtors.

Nelson has a bachelor's degree in industrial engineering from the Georgia Institute of Technology, and had gained extensive experience in the trailer leasing business before joining the Debtors. Over the last seven years, Nelson has been responsible for pricing approximately 25,000 units of trailer leasing opportunities. The record reflects that per-unit—that is, per-trailer—lease rates represent the single most important financial input in the Debtors' business. Nelson is responsible for setting the Debtors' lease rates and testified that he has substantial knowledge of competitors' pricing practices.

Both Sawyer and Nelson used their respective knowledge and experience to help develop the Debtors' current business plan, particularly with respect to lease rates and other key assumptions in the model that drive EBITDA during the projection period. The record reflects that the Debtors operate in a competitive marketplace, and that the rates they can charge their customers are directly tied to prevailing market rates and the age and quality of their trailer fleet. Nelson testified that the pricing incorporated in the business plan is competitive within the trailer leasing industry. (Tr. Trans. (10/4) at 14.). The Court found both Nelson and Sawyer to be credible witnesses.

The Debtors' business plan is contained in an Excel computer model that stretches over 900 pages and contains 28 separate worksheets. (*See* Tr. Ex. 12.) The record reflects that the process and methodologies used by the Debtors' management in preparing the current projections and business plan are, in all material respects, consistent with their pre-bankruptcy practice.

The Debtors' business plan began with the Debtors' current trailer fleet and existing utilization rates and pricing as of June 2011. (Tr. Trans. (10/3) at 55-57, 69.) Management then projected the company's performance into the future based on a variety of factors that drive rev-

enues, including utilization, price, fleet composition, the state of the economic environment generally, and the anticipated direction of the company's business. (Tr. Trans. (10/3) at 57, 62-65; Valuation Binder Ex. A at 4.) Capital expenditures ("CapEx") represents a critical component of the business plan because the plan assumes that all available capital will be deployed during the projection period to purchase new trailers. (Tr. Trans. (10/3) at 58.) That goes for all capital from external sources as well as all excess cash from the business. (Tr. Trans. (10/3) at 58; Tr. Trans. (10/4) at 31-32.) The plan contains projections for each of the thousands of new trailers the Debtors expect to acquire, including the cost to buy each trailer, the number of trailers that will be acquired, and the expected revenues from those trailers. (Tr. Trans. (10/3) at 57.)

The business plan assumes historically high utilization rates and competitive prices for the Debtors' business, but also takes into account factors such as seasonality and general economic conditions, which can have a significant impact on the Debtors' business, particularly short-term rents. (Tr. Trans. (10/3) at 40, 61; Valuation Binder Ex. A at 4.) Sawyer testified that, in his experience, when the economy dips rental revenues start to decrease. (Tr. Trans. (10/3) at 61.) He further testified that the state of the Debtors' business tends to slightly foreshadow the state of overall economy as represented through GDP. (Tr. Trans. (10/3) at 61, 73-74.)

The Debtors' project revenues to increase from $36.4 million to $43.7 million for the four-year span beginning in 2011 and ending in 2015, an increase of approximately 20%. (Tr. Trans. (10/3) at 58-59, 68; Tr. Ex. 219.) They likewise project EBITDA to grow during that period from $19.5 million to $26.3 million, an increase of approximately 35%. (Tr. Trans. (10/3) at 59, 68; Tr. Ex. 219.) There are, of course, risks that the business plan's projections will not be achieved -- for instance, if the overall economy drops-off in the next two years. (Tr. Trans. (10/3) at 81-82.) There is also execution risk under the business plan in that the Debtors will have to find customers for the thousands of new trailers that they expect to acquire. (Tr. Trans. (10/3) at 82.)

8

Fifth Street challenges the projections on two fundamental grounds. First, that the Debtors' projections are unreasonably pessimistic both in terms of their own performance and the prospects for overall economic growth. Second, that the projections are fatally flawed due to management's bias toward undervaluing the business so as to maximize the post-confirmation upside of their equity interests.

The Court starts from the basic proposition that preparing financial projections for a large operating business is equal parts science and art. *See Peltz v. Hatten*, 279 B.R. 710, 737 (D. Del. 2002) ("[W]hen it comes to valuation … reasonable minds can and often do disagree."). Indeed, "experts and industry analysts often disagree on … appropriate valuation … even when employing the same analytical tools …. This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature." *Id*. Moreover, according to one author, "projections may be difficult to make—and even more difficult to get two or more parties with different investment perspectives and transaction expectations to agree on." Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 84 (4th ed. 2000).

Put bluntly, these Debtors are in the business of moving and storing stuff; the more robust the economy, the more stuff there is to move and store, and the greater the demand for the Debtors' products and services. Thus, to develop the business plan and projections, the Debtors' management and its advisors used their understanding of the company's past performance, coupled with their predictions of economic conditions in the future, to estimate how the company will perform in the years to come. Fifth Street contends that the projections are inconsistent with other sources' more robust estimates of projected growth in domestic GDP; it quotes numerous industry sources that express optimism about strong demand in coming years. (Preston Reb. Rep. at 13.)[8]

---

[8] "Preston Reb. Rep." refers to the Expert Rebuttal Report of Seymour Preston, Jr. that appears in the Valuation Binder at tab C.

The Debtors' projections reflect the Debtors' optimism that both revenue and EBITDA will grow through 2015, (Tr. Trans. (10/3/) at 58-59, 68; Tr. Ex. 219), though Fifth Street accuses the Debtors of not being optimistic enough. Sawyer testified regarding his expectations as to overall utilization rates, and acknowledged that there are substantial risks regarding the overall weak global and domestic economic recovery and the prospect of another (or prolonged) recession, as well as execution risk in the Debtors' effort to implement their business plan. (Tr. Trans. (10/3/) at 75-81.) These factors, considered in light of Sawyer's credible testimony, lead the Court to conclude that the Debtors' projections, which underlie Torgove's valuation, are not fatally flawed or otherwise materially unreliable.[9]

This conclusion is not materially altered by the distinctions that Fifth Street raises between the Debtors' current projections and the information contained in the Confidential Information Memorandum (the "CIM"), (Tr. Ex.1), prepared in early 2010 in connection with the Debtors' unsuccessful capital raising effort. First, the Court notes that the CIM was prepared as part of a marketing effort in hopes of encourag-

---

[9] The Court notes that Fifth Street has also argued that the proposed stock distributions to management mean that the projections (and, ultimately, the Plan itself) are irretrievably tainted on account of management's self-interested bias toward a low valuation of the Debtors. The Court agrees with Fifth Street that the risk of self interest and bias mandates added scrutiny here. *See Exide Tech.*, 303 B.R. at 60, 65 (citing Gilson, Hotchkiss and Ruback, *Valuation of Bankruptcy Firms*, 13-1 Rev. of Fin. Stud. 43 (2003) (noting that management may see a direct economic benefit from undervaluing a company, where plan proposes equity grant in reorganized debtor)). However, given that, in the Court's experience, management's equity participation in a reorganized debtor is hardly unusual, and given further that there are sound, legitimate reasons that the new owners of a reorganized debtor may wish to ensure that management is invested in and incentivized to achieve success, it cannot be that an equity piece for management inevitably taints the process. When the Court considers the size and potential value of the proposed new equity distribution (7.5% outright, plus up to 7.5% more through options) in the context of these reorganization cases and weighs the credibility of management's testimony and the full body of evidence at trial, the Court is satisfied that the existence of the equity grant and the management options does not fatally undermine either the projections or the Plan here.

ing new private investment in the Debtors. As such, the CIM was drafted to serve an entirely different purpose than the projections filed with the Disclosure Statement filed in this bankruptcy case. Moreover, while the Court notes that the CIM is somewhat more optimistic about the Debtors' prospects and overall value, the fact remains that the 2010 capital raise was a failure. To the extent the Court can derive any lessons from the CIM, it may be that the marketplace was unwilling to lend significant credence to a robust valuation for the Debtors.

## B. Valuation Analysis

Both experts, Torgove and Preston, used the Debtors' business plan and projections to testify about the Debtors' enterprise value. Both also testified about the three generally-accepted methodologies for valuing a business: discounted cash flow, comparable companies; and precedent transactions.[10] Torgove prepared and filed the LMM Valuation and Preston filed a Rebuttal Report, but not a stand-alone valuation report. The Court begins with a brief discussion of Torgove's valuation analysis.

Torgove places the Debtors' TEV at between $76 million and $102 million, with a mid-point of $89 million.[11] (Tr. Trans. (10/4) at 116.) Consistent with the business plan, Torgove's valuation assumes that the reorganized Debtors will have at least $20 million in new working capital financing available to them post-confirmation, substantially all of which will go to purchase new trailers. (Valuation Binder Ex. A at 3.) As noted above, Torgove used all three of the widely-accepted valuation methodologies, and compared the results of each approach to arrive at his opinion of the Debtors' TEV, as summarized in the chart below:

---

[10] Additionally, the Debtors contend that the results of their unsuccessful prepetition capital raise effort in 2010 bolsters Torgove's conclusion that 5th Street is out of money. This argument is briefly addressed *infra*.

[11] Torgove's valuation does not, however, take into account the additional $26 million liability in Stoughton Leases that the Debtor plans to assume, and which must be factored-in before Fifth Street can show that it is in the money.

| METHODOLOGY | VALUATION RANGE |
|---|---|
| Discounted Cash Flow | $62,000,000 - $100,000,000 |
| Comparable Company: | |
| (2011P EBITDA) | $83,000,000 - $103,000,000 |
| (2012P EBITDA) | $78,000,000 - $100,000,000 |
| Precedent Transaction | $86,000,000 - $105,000,000 |
| Total Enterprise Value | $76,000,000 - $102,000,000 |

(Tr. Trans. (10/4) at 116-117; Valuation Binder Ex. B at 2.)

As noted above, Fifth Street relies upon Preston's Rebuttal Report to challenge the various assumptions and determinations underlying the LMM Valuation. Preston testified that numerous adjustments should be made in each of the component methodologies utilized in the LMM Valuation, with the resulting TEV ranging from $119 million to $159 million and a midpoint of $139 million.

Valuation of an operating business is by definition an inexact science, hence the use of multiple methodologies, approximate ranges and midpoints. It has been "aptly observed that 'entity valuation is much like a guess compounded by an estimate.'" 7 Collier on Bankruptcy ¶ 1129.05[3][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (quoting Peter Coogan, *Confirmation of a Plan Under the Bankruptcy Code*, 32 Case W. Res. L. Rev. 301, 313 n.62 (1982)). "Regardless of the method used, the result will rarely, if ever, be without doubt or variation." 7 Collier on Bankruptcy ¶ 1129.05[3][c]. As the United States Supreme Court has said:

> Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record,

and all circumstances which indicate whether or not that
record is a reliable criterion of future performance.

*Consolidated Rock Prods. Co. v. DuBois*, 312, U.S. 510, 526 (1941)).

The testimony of Torgove and Preston form the core of each side's valuation record. Each side has asked that the Court disregard, or at least discount, the opposing expert's testimony on the ground that it has been engineered to reduce or inflate value in furtherance of their respective clients' interests. As noted by Judge Carey recently in a valuation dispute, however, the Court is aware that "hired experts often approach their valuation task from an advocate's point of view." *In re Tribune Co.*, No. 08-13141, 2011 Bankr. LEXIS 4128, at *46 (Bankr. D. Del. Oct. 31, 2011); *accord In re Mirant Corp.*, 334 B.R. 800, 814-15 (Bankr. N.D. Tex. 2005) ("that experts may be anxious to serve in the interests of the parties retaining them is neither startling nor enough reason to disregard their testimony …. It simply means the Court must be cautious itself …"). The Court qualified Torgove and Preston as experts and each of them prepared diligently and testified credibly.

It is only after going through the multiple steps described by the Supreme Court in *Consolidated Rock*, and considering all of the evidence and testimony in proper context, that this Court can make an "informed judgment" as to the value of the Debtors. At bottom, in this case it is the Debtors' burden to demonstrate by a preponderance of the evidence that their valuation supports a Plan predicated upon TEV of less than $110 million.

### i. Discounted Cash Flow

The discounted cash flow analysis is a "forward-looking" method that "measures value by forecasting a firm's ability to generate cash." *Exide*, 303 B.R. at 63 (citations omitted). "Discounted cash flow is calculated by adding together (i) the present value of the company's projected distributable cash flows (i.e., cash flows available to investors) during the forecast period, and (ii) the present value of the company's terminal value (i.e., the value of the firm at the end of the forecast period)." *Id.*; *see also Genesis*, 266 B.R. at 613 n.19 ("discounted cash flow

analysis determines the cash flows that would be available to a poten-
tial investor, based on a required rate of return, to determine net
present value").

Here, Torgove's testimony reflects that he relied upon the Deb-
tors' projections in the business plan in performing his discounted cash
flow analysis. The projections assume year-over-year growth in reve-
nues and EBITDA based in part on the anticipated acquisition of new
trailers as part of the $20 million new working capital facility that will
be made available to the Debtors under the Plan. (Tr. Trans. (10/3) at
59, 68; Tr. Ex. 219.)

In reliance upon the business plan and without any adjustments
thereto, Torgove calculated a weighted average cost of capital of 11.3%-
13.3% and selected a range of exit multiples from 4.25x-6.25x under the
terminal multiple method. (Valuation Binder Ex. B at 2.) Torgove's
weighted average cost of capital: (a) includes a widely-accepted unsys-
tematic risk premium of 3.0%, which captures unique risks specific to
the Debtors, like the fact that the company has not had access to capital
to invest in new trailers for two years and is emerging from bankruptcy
with potentially strained relationships with customers and employees,
(Tr. Trans. (10/4) at 154-56); (b) utilizes a size risk premium based on
the 10(b) decile derived from Ibbotson, a standard valuation authority,
that appropriately takes into account the Debtors' anticipated equity
value, (Tr. Trans. (10/4) at 149-53; Tr. Ex. 205, 206); and (c) utilizes a
risk-free rate based on the estimated 20-year U.S. Treasury yield that is
the most commonly used and is the standard suggested by Ibbotson
(Tr. Trans. (10/4) at 156). These assumptions result in a valuation range
for the Debtors based on the discounted cash flow method in the range
of $62 million to $100 million with a mid-point value of $89 million. (Tr.
Trans. (10/4) at 158; Valuation Binder Ex. B at 2.)

Preston recommended a wide range of adjustments to the dis-
counted cash flow methodology in the LMM Valuation. Among other
points, Preston contends that projected CapEx should be reduced and
the rate of depreciation increased in determining the terminal value.

14

(Preston Reb. Rep. at 25-26.) Also, in the context of calculating terminal value, Preston criticizes the use of 2015 as the terminal year (allegedly a "down-cycle" year), and a perpetual growth rate of only 2-4% applied to cash flows from that terminal year, for purposes of estimating the Debtors' value in perpetuity. Finally, Preston challenges the decisions and assumptions made by Torgove in calculating these Debtors weighted average cost of capital. Specifically, Preston (i) criticizes the use of the 10(b) Ibbotson decile in determining the size risk premium applied in the LMM Valuation, recommending the use of Ibbotson decile 10 (which includes a much broader sample size); and (ii) contends that the application of a 3% "bankruptcy premium" improperly inflates these Debtors' projected borrowing costs.

After making these and other adjustments, Preston has developed two separate valuation ranges for the Debtors using the discounted cash flow methodology. First, in applying the perpetuity method, Preston identifies a very broad range of $87 million to $222 million, with a midpoint of $154 million. Second, applying the exit multiple method, Preston calculates a somewhat tighter value range of $100 million to $145 million, with a midpoint of $122.5 million. (Preston Reb. Rep. at 33, 35.)

The Court has previously observed that the process of valuing an operating business requires a host of individual judgment calls by the valuator. In the present case, the record developed at trial reflects that Torgove's valuation is based upon the projections prepared by management and was prepared in accordance with standard and generally-accepted methodologies and assumptions. The Court recognizes and respects that Preston would have made a number of different decisions or assumptions, and the valuation exercise is sufficiently malleable or fluid to support those differing approaches. Nevertheless, having determined that the LMM Valuation is predicated upon reliable projections and generally-accepted valuation principles, the Court does not conclude that the differences of opinion and judgment between Preston

and Torgove render the discounted cash flow analysis in the LMM Valuation flawed or materially unreliable.

### ii. Comparable Company Analysis

The key components of a comparable company analysis are the Debtor's EBITDA  and the selection of an appropriate multiple to apply to the EBITDA to arrive at enterprise value." *Exide*, 303 B.R. at 61. A subjective assessment is required to select the comparable companies. *Id*.

Torgove identified six publicly-traded companies that he deemed to be comparable to the Debtors. (Valuation Binder Ex. A at 19.) He considered, but ultimately excluded, eight other companies (originally identified in the CIM in 2010) as possible candidates for inclusion in the peer group with the Debtors. (Valuation Binder Ex. A at 19.) Preston's Rebuttal Report proposes to add four of these additional "comparable companies" to the six Torgove selected. (Valuation Binder Ex. C at 16.) Preston strongly criticizes the LMM Valuation for choosing a skewed set of only six out of the fourteen companies that had been included in the CIM in 2010. Preston contends that without that broader pool of comparable companies identified in the CIM, Torgove's analysis artificially depresses the Debtors' TEV. (Preston Reb. Rep. at 7.)

As a threshold matter, the Court reiterates its reservations about relying on the CIM as a tool to measure the accuracy or integrity of the LMM Valuation and the Debtors' current valuation. The CIM was a marketing piece created to support a fund-raising effort in the capital markets that ultimately failed. It was created in a somewhat different time frame and for a completely different purpose than the Debtors' Disclosure Statement and the LMM Valuation. Indeed, the CIM was presumably prepared to foster enthusiasm in the capital markets for the Debtors as an attractive investment opportunity. The Disclosure Statement and the LMM Valuation, on the other hand, were developed in the pursuit of confirmation of a proposed Plan that presumes that the value of the Debtors' business does not extend past the first lien debt (viz., $83.4 million plus the Stoughton Leases).

Case law teaches, of course, that courts considering competing valuations should always be wary (or at least cognizant) of the ultimate motives and economic interests of those proffering a particular position or analysis. *Mirant*, 334 B.R. at 815. Thus when the Court considers the CIM, LMM Valuation, and Preston Rebuttal Report, it remains cognizant of the context in which they were developed and the interests of the parties standing behind them. This recognition does not render the submissions invalid, it just means that the Court is obliged to cast a skeptical eye on all of the evidence, and to allow the adversarial process to run its course through trial.

As noted, the CIM identified fourteen companies in its comparable company analysis, and Torgove included six of these companies (and did not include the other eight) in his analysis. Preston contends that four of the excluded companies should have been included,[12] with a substantial upward effect on this component of the valuation analysis.

Torgove testified to the difficulty in identifying appropriate candidates to include in his analysis due to the nature of the Debtors' business and the fact that other publicly traded companies in that business are significantly larger than the Debtors. (Tr. Trans. (10/4) at 192) For example, three of the six comparable companies used by Torgove are Ryder, United Rentals, and TAL International, with disclosed enterprise values of $5.6 billion, $3.3 billion and $2.9 billion, respectively — placing these companies between 30 and 50 times the size of these Debtors.

Preston contends that Cramo Oyj, Essex Rental, Touax SA and GATX Corp. all should have been included in Torgove's analysis. (Preston Reb. Rep. at 16.) Torgove testified, however, that he excluded both Cramo Oyj and Touax SA because those companies do almost no business in the United States. (Tr. Trans. (10/4) at 125-30.) The Court finds that to be a legitimate reason to exclusion them. As to GATX, Torgove testified that its enterprise value far exceeds that of the Debtors, and

---

[12] Preston agreed that the last four of the fourteen were not good comparables and were properly excluded by Torgove. (Preston. Reb. Rep. at 15.)

that he believed GATX's business operations are not fairly comparable to the Debtors. (Tr. Trans. (10/4) at 128; Tr. Ex 1 at 35) Among other things, GATX owns a fleet of ships and railroad locomotives. (Tr. Trans. (10/4) at 128; (10/5) 7-9.) Again, while reasonable valuators could differ on the appropriateness of including GATX (a company at least 40 times larger than these Debtors), the Court cannot find that Torgove's decision in this respect was unreasonable.

Finally, and most importantly, Preston contends that Essex Rental should have been included. Essex Rental leases cranes and construction equipment. At approximately $300 million in enterprise value and a facially similar line of business, Essex Rental does appear a good candidate for comparison. However, Torgove identified several factors which led him to conclude that Essex Rental would not provide a good or informative comparison. (Tr. Trans. (10/4) at 126-28.)

Specifically, Essex's business differs materially from the Debtors in that the main products Essex offer for lease are large, mobile cranes made of high-quality steel alloys which enjoy usable lives in excess of 50 years and actually appreciate in value over time. More importantly, Essex Rental shows a trading multiple of 19.5 x EBITDA, a multiple far outside the range of other companies in the analysis. Torgove concluded, and the Court agrees, that Essex Rental is an outlier and was properly excluded from the comparable companies analysis in the LMM Valuation.[13]

Torgove focused on the TEV/EBITDA of the Debtors' peer group of comparable publicly traded companies. Given the Debtors have substantially lower revenues and growth prospects than the comparable companies—and hence greater risks—Torgove used the 25th percentile of the range of implied total enterprise value multiples of comparable companies. (Tr. Trans. (10/4) at 135; Tr. Trans. (10/05) at 11.) He considered comparable company projections for years 2011 and 2012, which

---

[13] This determination is buttressed by the observation that the inclusion of Essex Rental in Preston's analysis serves to increase the estimated value by nearly $25 million.

yielded multiples of EBITDA in the range of 3.6x to 5.3x and a valuation range for the Debtors of $78 million to $103 million (Valuation Binder Ex. A at 24.)

### iii. Precedent Transaction Analysis

"The [precedent] transaction analysis is similar to the comparable company analysis in that an EBITDA multiple is determined from recent merger and acquisition transactions … and is then applied to the appropriate trailing twelve months of the Debtor." *Exide*, 303 B.R. at 62. Precedent transactions, however, are only comparable if similar market conditions existed when the precedent transaction occurred and the precedent is actually analogous. *Id*. at 61.

Torgove identified fourteen precedent transactions involving equipment-related rental businesses like the Debtors for the five-year period between March 2006 and May 2011. No transactions involving less than $10 million or more than $500 million of enterprise value were included in the analysis. (Tr. Trans. (10/4) at 141; Valuation Binder Ex. A at 27.) Based on the value of these transactions, Torgove implied a valuation multiple of 4.4x to 5.4x against the Debtors' last twelve months adjusted EBITDA, which resulted in a valuation range for the Debtors of $86 million to $105 million. (Valuation Binder Ex. A at 29.)

As with the comparable company analysis, the main bone of contention between the competing experts is in the decision to exclude several of the transactions identified in the CIM from the LMM Valuation. The Court has earlier observed that the decisions and judgments made in connection with preparation of the CIM are at best relevant to, but certainly not dispositive of, this valuation exercise. When those transactions are included as Preston recommends, the mean and median multiple would increase to 5.5%. Using this broader sample of transactions and a slightly higher multiple than Torgove, Preston contends that the precedent transactions methodology results in a valuation range for the Debtors stretching from $99 million to $188 million.

The record developed at trial reveals relatively little information regarding the suitability of these three additional transactions and Tor-

gove's rationale for excluding them from the LMM Report. Similarly, other than the fact that they were included in the CIM, Preston did not offer much guidance on why he believed they should be included in the LMM Report. However, the Court does struggle with the broad range of value calculated as a result of Preston's adjustments to the LMM Valuation: a range of $99-$188 million is sufficiently wide so as to impair its usefulness as a value metric.

### iv. Conclusion on Valuation

The LMM Valuation posits a range of value for the Debtors of $76-$102 million, with a midpoint of $89 million. After making numerous changes or adjustments to the projections and the LMM Valuation, Preston posits a range of TEV from $119 million to $159 million. As noted above, starting with the first lien debt of $84 million held by Garrison and taking into account the additional $26 million in liability on the Stoughton Leases, the TEV hurdle Fifth Street must overcome before it can show it is in the money is $110 million.

The Court has previously determined that the LMM Valuation was prepared according to widely-accepted methodologies and standards, and in reliance upon projections properly prepared by management. To the extent that the Preston Rebuttal Report identifies legitimate concerns with, or appropriate adjustments to, the LMM Valuation, they are not sufficient to materially affect or change the LMM Valuation. The Court thus concludes that the Debtors have carried their burden to demonstrate that the Debtors' TEV is below the $110 million threshold.

## C. The United States Trustee Objection

The U.S. Trustee objects the Plan provision that proposes to exculpate a variety of parties from potential liability arising out of their participation in these proceedings. It is the position of the U.S. Trustee that the Plan's exculpation provisions go beyond what is contemplated and permitted under the Bankruptcy Code. The Plan's exculpation provision currently reads, in its entirely, as follows:

> As of and subject to the occurrence of the Effective Date, each of the Debtors, the Prepetition Agent, Holders of First Lien Credit Agreement Claims, Coda Capital Partners L.L.C. and its affiliates, Angel, Gordon & Co. LP and its affiliates, and each of their respective Agents, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or consummation of the Plan or any contract, instrument, waiver, release, or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

(Plan at 56.)

The U.S. Trustee argues that this provision goes too far because it would exculpate prepetition lenders—specifically, Garrison, Angelo, Gordon & Co., and Coda Capital—who are not estate fiduciaries or their professionals. As support for its view that the Court should limit the scope of the exculpation clause to cover estate fiduciaries, the U.S. Trustee cites to *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011). In that case, the plan at issue proposed to exculpate and release parties, some of whom were fiduciaries, some not, for actions taken during the bankruptcy case. Because the court viewed the exculpation clause as "either duplicative of [the] releases ... or ... an effort to extend those releases" to non-fiduciaries, it found the exculpation clause "much too broad." *Id*. at 350. Such clauses, the court held, "must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers." *Id*. at 350-51.

21

The *Washington Mutual* court based its reasoning on the Third Circuit's decision in *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000), which held that a plan may exculpate a creditor's committee, its members, and estate professionals for their actions in the bankruptcy case, except where those actions amount to willful misconduct or gross negligence. *Id.* at 246. In reaching its conclusion, the *PWS* court examined § 1103(c)[14] and noted that the section "has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members." *Id.* "This immunity," the court found, "covers committee members for actions within the scope of their duties." *Id.* The *PWS* court's reasoning thus implies that a party's exculpation is based upon its role or status as a fiduciary. That is why, as the *Washington Mutual* court pointed out, courts have permitted exculpation clauses insofar as they "merely state[] the standard to which ... estate fiduciaries [a]re held in a chapter 11 case." *Wash. Mut.*, 442 B.R. as 350. "That fiduciary standard, however, applies only to estate fiduciaries," no one else. Accordingly, the exculpation clause here must be reeled into include only those parties who have acted as estate fiduciaries and their professionals. *See Tribune*, 2011 Bankr. LEXIS 4128 at *160-61 (holding that exculpation provision must "exclude non-fiduciaries"). The U.S. Trustee's objection is therefore sustained.[15]

---

[14] 11 U.S.C. § 1103(c) provides:

(c)    A committee appointed under section 1102 of this title may –

(1)    consult with the trustee or debtor in possession concerning the administration of the case;

(2)    investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a plan;

(3)    participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections to the plan;

(4)    request the appointment of a trustee or examiner under section 1104 of this title; and

(5)    perform such other services as are in the interest of those represented.

[15] The Court is aware that sustaining the U.S. Trustee's objection is unlikely to have much practical effect because Garrison, which will hold or control any caus-

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the Plan has been submitted in good faith, and the Court further finds that the Debtors have carried their burden to demonstrate that the plan is fair and equitable, and otherwise sufficient to warrant confirmation of the Plan. Counsel for the Debtors shall promptly file a certification of counsel with an appropriate form of order confirming the Plan.

**BY THE COURT**:

Dated: November 10, 2011
Wilmington, Delaware

_____
Brendan Linehan Shannon
United States Bankruptcy Judge

---

es of action against Angelo, Gordon & Co. and Coda Capital, has already agreed not to pursue them. Even so, the Court cannot take a "no harm, no foul" approach to an exculpatory provision that exceed the authority provided under the Bankruptcy Code.